## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:24-CR-00768 |
| v. | (Chief Judge Brann)* |
| JULIEN GIRAUD JR., and JULIEN GIRAUD III, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | No. 2:25-CR-00436 |
| v. | (Chief Judge Brann)* |
| CESAR HUMBERTO PINA, | |
| Defendant. | |

## MEMORANDUM OPINION

### AUGUST 21, 2025

The Executive branch has perpetuated Alina Habba's appointment to act as the United States Attorney for the District of New Jersey through a novel series of legal and personnel moves. Along the way, it has disagreed with the Judges of the United States District Court for the District of New Jersey and criminal defendants in that District about who should or may lead the office. Faced with the question of whether Ms. Habba is lawfully performing the functions and duties of the office of the United States Attorney for the District of New Jersey, I conclude that she is not.

---

* The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District of Pennsylvania, sitting by designation.

The pending motions challenge the legality of Alina Habba's appointment to serve as Acting United States Attorney for the District of New Jersey. They also raise questions about the viability of actions that she took while purporting to be serving as the Interim United States Attorney. After reviewing several issues of first impression, the Court concludes that Ms. Habba has exercised the functions and duties of the office of the United States Attorney for the District of New Jersey without lawful authority since July 1, 2025. Her actions since that point may be declared void, including her approval of the indictment of Defendant Cesar Humberto Pina, although that fact does not require its dismissal. And because she is not currently qualified to exercise the functions and duties of the office in an acting capacity, she must be disqualified from participating in any ongoing cases, including Mr. Pina's and those of Defendants Julien Giraud Jr. and Julien Giraud III ("the Girauds"). Accordingly, for the following reasons, the Girauds' remaining relief is granted, and Mr. Pina's motion is granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The following factual background is largely duplicated from the Court's prior Memorandum Opinion in this matter, given that few of the facts are disputed and all parties have adopted that recitation.[1] I have added additional citation where

---

[1]    *United States v. Giraud*, No. 1:24-CR-0768, 2025 WL 2196794, at *1-3 (D.N.J. Aug. 1, 2025).

development of the record has resolved factual disputes, and I include discussion of events that have become relevant or occurred since the prior Opinion.

On November 21, 2024, a federal Grand Jury in the District of New Jersey returned a three-count indictment charging the Girauds with drug and firearm offenses.[2] That indictment was signed by then-United States Attorney for the District of New Jersey Philip R. Sellinger.[3] Mr. Sellinger was nominated for the United States Attorney role by former-President Joseph R. Biden, Jr. and confirmed to that position by the United States Senate by voice vote.[4]

As is standard practice, Mr. Sellinger resigned from the United States Attorney position at the end of Mr. Biden's term to make way for the Trump Administration's nominee.[5] Upon Mr. Sellinger's resignation, First Assistant United States Attorney Vikas Khanna became Acting United States Attorney pursuant to the Federal Vacancies Reform Act ("FVRA").[6] Mr. Khanna continued in the Acting role until March 3, 2025, when the Trump Administration appointed John Giordano as Interim United States Attorney pursuant to 28 U.S.C. § 546(a)'s vacancy

---

[2]   Doc. 54 (Indictment) (charging violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1)(A)(i)). Unless otherwise indicated, citations to the Docket refer to that of the *Giraud* matter.

[3]   *Id.* at 6.

[4]   Nomination of Philip R. Sellinger for Department of Justice, 117th Congress (2021-2022), PN1301, 117th Cong. (2021), https://www.congress.gov/nomination/117th-congress/1301.

[5]   Press Release, *U.S. Attorney Philip R. Sellinger Announces His Resignation*, U.S. Attorney's Office for the District of New Jersey (Dec. 23, 2024), https://www.justice.gov/usao-nj/pr/us-attorney-philip-r-sellinger-announces-his-resignation (announcing resignation to take effect "at 11:59 p.m., Jan. 8, 2025"); *see* Doc. 115 (Correction Letter).

[6]   *Id.*; *see* 5 U.S.C. § 3345(a)(1).

provisions.[7] Mr. Giordano held that role for approximately three weeks. On March 24, 2025, President Trump posted to his social media website, Truth Social, that "Alina Habba . . . will be our interim U.S. Attorney for the District of New Jersey . . . effective immediately," while Mr. Giordano "will now be nominated as the new Ambassador to Namibia."[8] Ms. Habba was formally sworn in to the Interim United States Attorney position by Attorney General Pamela Bondi pursuant to section 546(a) on March 28, 2025.[9] Although the defendants contend that Ms. Habba's appointment should be considered effective on the date of President Trump's post, it is now clear that she did not assume the role of Interim United States Attorney until she was sworn in on March 28.[10]

Interim appointments under section 546 are time limited. The statute provides that "[a] person appointed as United States attorney under this section may serve until the earlier of" the Senate's confirmation of the President's nominee to the full

---

[7] Press Release, *John Giordano Sworn In As 64th U.S. Attorney For District Of New Jersey*, U.S. Attorney's Office for the District of New Jersey (March 5, 2025), https://www.justice.gov/usao-nj/pr/john-giordano-sworn-64th-us-attorney-district-new-jersey (announcing that Mr. Giordano was sworn in on March 3, 2025).

[8] Donald J. Trump (@realDonaldTrump), Truth Social (March 24, 2025, 10:37 AM), https://truthsocial.com/@realDonaldTrump/posts/114217913229258108.

[9] Doc. 108-1 (Order of Appointment).

[10] Doc. 141 (Hrg. Tr.) at 9:19-10:6 (affirming that Mr. Giordano continued signing filings as Interim United States Attorney until March 28); *id.* at 21:7-18 (stating that Ms. Habba's salary became effective on March 29); *see, e.g.*, Information, *United States v. Shoultz*, No. 25-cr-0165 (D.N.J. Mar. 24, 2025), Doc. 56 (signed by Mr. Giordano); Information, *United States v. Ramirez-Sanchez*, No. 25-cr-0179 (D.N.J. Mar. 25, 2025), Doc. 23 (signed by Mr. Giordano); Information, *United States v. Morales-Martinez*, No. 25-cr-0170 (D.N.J. Mar. 26, 2025), Doc. 9 (signed by Mr. Giordano); Indictment, *United States v. Pena Peralta*, No. 25-cr-0181 (D.N.J. Mar. 27, 2025), Doc. 39 (signed by Mr. Giordano).

position, or "the expiration of 120 days after appointment by the Attorney General under this section."[11] For Ms. Habba, that meant that her term ended, at the latest, on Saturday, July 26, 2025.[12]

On June 30, 2025, with about one month remaining in her interim appointment as the Government saw it, President Trump formally nominated Ms. Habba to be the United States Attorney.[13] But the Senate did not act, and July 26 grew nearer.

A week after Ms. Habba was nominated to be the United States Attorney, on July 7, 2025, she signed Mr. Pina's indictment, charging him with six counts including charges for wire fraud, money laundering, and bribery.[14]

On July 22, 2025—120 days from March 24, 2025, when President Trump posted that Ms. Habba had been appointed "effective immediately"—the Judges of the United States District Court for the District of New Jersey invoked their statutory power to appoint a United States Attorney upon the expiration of an Interim United States Attorney's 120-day term pursuant to section 546(d).[15] The Court issued a Standing Order appointing Desiree Grace (Ms. Habba's First Assistant) as the United States Attorney and, acknowledging the uncertainty regarding the commencement date of Ms. Habba's term as Interim United States Attorney (Ms.

---

[11]   28 U.S.C. § 546(c).

[12]   *See* Doc. 108-2 (Order Extending Appointment) (listing final date of 7/25/25).

[13]   Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12.

[14]   *Pina* Doc. 44 (Indictment) at 20.

[15]   28 U.S.C. § 546(d).

Bondi's Order appointing Ms. Habba does not appear to have been a matter of public record before this litigation), made that appointment effective "July 22, 2025 or 'upon the expiration of 120 days after appointment by the Attorney General' of the Interim U.S. Attorney Alina Habba, whichever is later."[16] Trump Administration officials were not pleased with that appointment.

Before the court issued its Standing Order, Deputy Attorney General Todd Blanche accused "[t]he district court judges in NJ [of] trying to force out [Ms. Habba] before her term expires at 11:59 p.m. Friday."[17] And after the Order was docketed, Ms. Bondi posted that "politically minded judges refused to allow [Ms. Habba] to continue in her position, replacing Alina with the First Assistant."[18] To counter those judges, Ms. Bondi stated that "the First Assistant United States Attorney in New Jersey"—Ms. Grace—"has just been removed."[19] Mr. Blanche affirmed Ms. Bondi's announcement and added that Ms. Grace's removal was "[p]ursuant to the President's authority."[20] It does appear that Ms. Grace was terminated from her position with the Department of Justice on July 22, 2025.[21] But

---

[16] *In re Appointment of United States Attorney for the District of New Jersey*, Standing Order 2025-03 (D.N.J. July 22, 2025).

[17] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 2:02 PM), https://x.com/DAGToddBlanche/status/1947718932908982301.

[18] Pam Bondi (@AGPamBondi), X (July 22, 2025, 5:18 PM), https://x.com/AGPamBondi/status/1947768353025556950.

[19] *Id.*

[20] Todd Blanche (@DAGToddBlanche), X (July 22, 2025, 5:19 PM), https://x.com/DAGToddBlanche/status/1947768601454514308.

[21] Doc. 108-3 (Termination Letter).

that termination does not purport to come from President Trump, as Mr. Blanche suggested.[22]

Notwithstanding her termination from the Department of Justice, the next day, July 23, 2025, Ms. Grace posted that she intended to "follow that Order [of the District of New Jersey] and begin to serve in accordance with the law."[23] But Ms. Grace did not take a position on when her appointment was effective.

Trump Administration officials, believing that Ms. Habba's term did not end until midnight on Friday, July 25, 2025, conceived a multi-step maneuver to keep her in the United States Attorney role. On July 24, 2025, the Administration made five moves. First, Ms. Habba's nomination to be the United States Attorney was withdrawn.[24] Second, Ms. Habba resigned from her position as Interim United States

---

[22] *Id.*

[23] Desiree Grace, LinkedIn (July 23, 2025), https://www.linkedin.com/posts/desiree-grace-78288115_it-has-been-the-honor-of-a-lifetime-to-represent-activity-7353908927010328576-ksOH?utm_source=li_share&utm_content=feedcontent&utm_medium=g_dt_web&utm_campaign=copy.

[24] Nomination of Alina Habba for Department of Justice, 119th Congress (2025-2026), PN379-12, 119th Cong. (2025), https://www.congress.gov/nomination/119th-congress/379/12. The Government asserts that the withdrawal of Ms. Habba's nomination preceded her resignation as Interim United States Attorney because it is noted on the Senate record for July 24, and the Senate adjourned for the day at 3:02 p.m. Indeed, it does appear that the message of withdrawal was transmitted before the Senate adjourned. 171 Cong. Rec. S4697 (daily ed. July 24, 2025) (noting during morning business that the Senate received "a message from the President of the United States submitting a withdrawal which was referred to the appropriate committee. (The message received today is printed at the end of the Senate proceedings.)"); *id.* at S4756 (lone withdrawal stating "Executive Message transmitted by the President to the Senate on July 24, 2025 withdrawing from further Senate consideration the following nomination: Alina Habba, of New Jersey, to be United States Attorney for the District of New Jersey. . . ." and noting adjournment at 3:02 p.m.).

Attorney.[25] Third, Ms. Bondi appointed Ms. Habba as a "Special Attorney to the Attorney General" pursuant to 28 U.S.C. §§ 509, 510, and 515 and "authorized [her] to conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct."[26] Fourth, Ms. Bondi appointed Ms. Habba to the (vacant due to Ms. Grace's termination) position of First Assistant United States Attorney.[27] And fifth, according to the Government, Ms. Habba was automatically elevated to the position of Acting United States Attorney pursuant to the FVRA by virtue of her new role as First Assistant United States Attorney and the vacancy in the United States Attorney position that followed from her resignation—presumably moments earlier—from the Interim United States Attorney position.[28] Ms. Habba confirmed her view of the events that evening, posting "I am now the Acting United States Attorney for the District of New Jersey."[29]

Ms. Grace remained a loose end, given her express intent to accept her appointment by the District Court, so the Administration's last act was to nip that in the bud. On Saturday, July 26, 2025—the date when Ms. Grace's appointment would

---

[25]  Doc. 108-4 (Resignation Letter).

[26]  Docs. 108-5 & 108-6 (Appointment Letter), 108-7 (Appointment Order).

[27]  Doc. 108-7.

[28]  *See* Doc. 108 (Opp'n) at 6, 8 (citing 5 U.S.C. § 3345(a)(1)). Whether this actually triggers a "vacancy" under the FVRA is a disputed question of law.

[29]  Alina    Habba    (@USAttyHabba),    X    (July    24,    2025,    5:04    PM), https://x.com/USAttyHabba/status/1948489536507707793.

have become effective under sections 546(c) and (d)—Administration officials sent a letter and email to Ms. Grace informing her that her appointment had never become effective because Habba's term as Interim United States Attorney did not "expire" (she instead resigned and then became the Acting United States Attorney) and, just in case, stating that "the President of the United States has removed you from that office today, pursuant to his authority under 28 U.S.C. § 541(c) and Article II of the U.S. Constitution."[30] The Government includes an affidavit from Sergio Gor, Assistant to the President and Director of the Office of Presidential Personnel, which attests that the termination email invoking the President's authority was sent "at [Mr. Gor's] direction to implement the President's decision to remove Ms. Grace in connection with the President's determination that Alina Habba should serve as Acting United States Attorney and continue leading the U.S. Attorney's office for the District of New Jersey."[31] At oral argument on August 15, 2025, the Government stated "that Mr. Gor did personally interact with the President on that and received that direction from the President."[32] In the absence of any countervailing evidence, the Court accepts this representation.

Mr. Giraud Jr. filed his motion to dismiss the next day, Sunday, July 27, 2025, arguing that Ms. Habba's appointment to the Acting United States Attorney position

---

[30]  Doc. 108-8 (Letter to Desiree Grace); *see* Doc. 108-9 (Email to Desiree Grace).
[31]  Doc. 127-2 (Decl. of Sergio Gor) ¶ 5.
[32]  Doc. 141 at 22:11-19.

was illegal,[33] and Mr. Giraud III moved to join in that motion on Monday, July 28, 2025.[34]

On Monday morning, July 28, 2025, the Honorable Edward S. Kiel, who was then presiding in the Giraud case, converted a previously scheduled motions hearing into a status conference and advised the parties that the trial and other pretrial proceedings would be stayed pending resolution of the motion to dismiss.[35] Shortly thereafter, the Honorable Michael A. Chagares, Chief Judge of the United States Court of Appeals for the Third Circuit, designated me for service in the District of New Jersey pursuant to 28 U.S.C. § 292(b) and reassigned this matter "and all related cases" to me.[36]

The following day, I held a status conference with counsel at which I explained that I would consider the issues in this matter in two stages.[37] First, I ordered briefing on the "threshold" issue of "whether the Girauds were entitled to any relief assuming Ms. Habba's appointment was illegal."[38] The parties briefed that issue, and I determined that the Girauds were not entitled to dismissal of their indictment, but that their request to disqualify Ms. Habba from participating in their prosecution raised a viable basis for relief.[39] Accordingly, I ordered further briefing

---

[33]   Doc. 99 (Giraud Mot.).
[34]   Doc. 101 (Mot. for Joinder).
[35]   Doc. 102 (Minute Entry).
[36]   Doc. 103 (Designation Order).
[37]   Doc. 110 (Minute Entry – July 29, 2025).
[38]   *Giraud*, 2025 WL 2196794, at *3.
[39]   *See generally id.*

on the "merits" issue of whether Ms. Habba was unlawfully appointed, and set a date for oral argument on the matter.[40] I also permitted the submission of *amicus* briefs, four of which were submitted.[41] Finally, I granted *amicus curiae* the Association of Criminal Defense Lawyers of New Jersey's ("ACDL-NJ") motion to participate in oral argument.[42]

On Monday, August 11, 2025, Mr. Pina filed his motion to dismiss the indictment raising arguments that substantially overlapped with the Girauds'.[43] The Pina matter was reassigned to me the next day pursuant to an Order of the Honorable Madeline Cox Arleo.[44] I held a joint status conference on August 13, 2025, in both the Giraud and Pina matters, at which all participants agreed to combine the motions for a single oral argument.[45]

On August 15, 2025, following briefing, the Court held oral argument on the motions in both cases. At the close of oral argument, the parties agreed that optional supplemental briefing was appropriate, and I set a briefing deadline for Monday,

---

[40]  Doc. 117 (Order).
[41]  *Id.*; Docs. 129 (Lawyers for the Rule of Law Amicus Mot.), 135 (Bipartisan Current and Former Members of Congress Amicus Mot.), 136 (Association of Criminal Defense Lawyers of New Jersey Amicus Brief), 138 (Former Republican Members of Congress Mot.). No party has opposed any of the motions to file an *amicus* brief, and all are therefore granted.
[42]  Doc. 126 (Order).
[43]  *Pina* Doc. 52 (Mot. to Dismiss).
[44]  *Pina* Doc. 57 (Order).
[45]  *See* Doc. 133 (Order); *Pina* Doc. 60 (Order).

August 18.[46] Those briefs have been submitted, and the motions are now ripe for review.

For the reasons that follow, the Girauds' motion to disqualify Ms. Habba from participating in their prosecution is granted, and Mr. Pina's motion to dismiss the indictment and disqualify Ms. Habba is denied in part and granted in part.

## II.    LEGAL BACKROUND

Familiarity with the applicable constitutional and statutory provisions and relevant standard of review is necessary to understand the intricate analyses that follow. I therefore detail (1) the constitutional provisions in issue, (2) the applicable statutes, and (3) the principles of statutory interpretation.

### A.    The Appointments Clause

"The 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power, because 'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'"[47] Responding to that problem, the Framers devised the Appointments Clause.[48] The Clause provides that:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United states, whose appointments are not herein

---

[46]    Doc. 139 (Order).
[47]    *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (citing G. Wood, *The Creation of The American Republic 1776–1787*, 79, 143 (1969)).
[48]    U.S. Const. art. II, § 2, cl. 2.

> otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.[49]

Through the Appointments Clause, the Constitution divides the power of appointments between the legislative and executive branches through the "default" rule of Presidential nomination and Senatorial consent (offices subject to this rule are often called "PAS" offices).[50] That rule combines the benefits of vesting the selection of officers in a single person[51] with the "check upon a spirit of favoritism in the President" that "cooperation of the Senate" offers.[52] Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard of the constitutional scheme,'"[53] protecting against unilateral appointment by the President of "candidates who ha[ve] no other merit than that . . . of being in some way or other personally allied to him, or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."[54]

Of course, in a complex government there will be many officials to appoint and "[t]he constitutional process of Presidential appointment and Senate confirmation . . . can take time."[55] Anticipating this issue, the Framers added the

---

[49] *Id.*

[50] *Edmond v. United States*, 520 U.S. 651, 659-60 (1997).

[51] *See* The Federalist No. 76, at 405 (Alexander Hamilton) (Sweet Water Press ed., 2017) (discussing problems with selection of officials by an assembly).

[52] *Id.* at 406-07.

[53] *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting *Edmond*, 520 U.S. at 659).

[54] The Federalist No. 76, at 407.

[55] *SW Gen.*, 580 U.S. at 293.

"Excepting Clause" for "administrative convenience," permitting Congress to either retain its advice and consent role for inferior officers or allow their direct appointment by either the President, a Department Head, or the courts.[56] Additionally, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval."[57] This framework is designed to carefully balance the separation of powers and prevent "one branch's aggrandizing its power at the expense of another branch"[58] while at the same time ensuring that the work of Government gets done.

The Constitution's structural provisions, including the Appointments Clause, are "designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty."[59] And "when questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch 'to say what the law is.'"[60] In such cases, courts "do[] not defer to the other branches' resolution of such controversies . . . [r]ather, policing the 'enduring structure' of constitutional government when the political branches fail to do so is 'one of the most vital

---

[56] *Edmond*, 520 U.S. at 660; *United States v. Arthrex*, 594 U.S. 1, 12 (2021).
[57] *SW Gen.*, 580 U.S. at 294.
[58] *Freytag*, 501 U.S. at 878, 882.
[59] *SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Scalia, J., concurring in judgment)).
[60] *Noel Canning*, 573 U.S. at 571 (Scalia, J., concurring in judgment) (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).

functions of th[e] [Judiciary].'"[61] The same principles must apply when interpreting statutory provisions allocating authority between the branches pursuant to these constitutional provisions.[62] Congress is expected to speak clearly when it rebalances the separation of powers,[63] and courts should be chary of Executive branch interpretations of structural enactments that result in greater arrogation of power to the President.[64] That watchfulness is heightened where, as here, there is a long history of "interbranch conflict" over the allocation of authority in question, throughout which the Executive has repeatedly taken an expansive view of

---

[61] *Id.* at 571-72 (Scalia, J., concurring in judgment) (citing *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring) and quoting *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J. concurring in judgment)).

[62] *Cf. SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) ("That the Senate voluntarily relinquished its advice-and-consent power in the FVRA does not make this end-run around the Appointments Clause constitutional.").

[63] *West Virginia v. EPA*, 597 U.S. 697, 740-42 (2022) (Gorsuch, J., concurring) (describing importance of clear-statement rule in case about "self-government, equality, fair notice, federalism, and the separation of powers"); *see Myers v. United States*, 272 U.S. 52, 116 (1926) ("[T]he reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires.").

[64] *See FCC v. Consumers' Rsch.*, 606 U.S. __, 145 S. Ct. 2482, 2538-39 (2025) (Gorsuch, J., dissenting); *Gundy v. United States*, 588 U.S. 128, 168-69 (2019) (Gorsuch, J., dissenting) (warning that "abdication" of judicial enforcement of the separation of powers risks "accelerat[ing] the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties."); *United States v. Midwest Oil Co.*, 236 U.S. 459, 511 (1915) ("The grant of authority to the Executive, as to other departments of the government, ought not to be amplified by judicial decisions."); *cf. United States v. Texas*, 599 U.S. 670, 735 (2023) (Alito, J., dissenting) ("This sweeping Executive Power endorsed by today's decision may at first be warmly received by champions of a strong Presidential power, but if Presidents can expand their powers as far as they can manage in a test of strength with Congress, presumably Congress can cut executive power as much as it can manage by wielding the formidable weapons at its disposal. That is not what the Constitution envisions.").

Congressional cessions of power, and Congress has consistently acted to refute these "threat[s] to the Senate's advice and consent power."[65]

### B.    Statutory Provisions

For United States Attorneys, Congress has preserved the constitutional default rule of Presidential appointment and Senate confirmation.[66] United States Attorneys are appointed for four-year terms, and always remain "subject to removal by the President."[67]

But when a United States Attorney's office is vacant, Congress has provided several alternative options to ensure that the functions of that office are carried out. Most directly, 28 U.S.C. § 546 provides the Attorney General with the power to temporarily "appoint a United States attorney for the district in which the office of United States attorney is vacant."[68] The Attorney General may not appoint "a person whose appointment by the President to that office the Senate has refused to give advice and consent,"[69] and "[a] person appointed as United States attorney under this section may serve until the earlier of" the Senate's confirmation of a Presidential appointee for the office, or "the expiration of 120 days after appointment by the Attorney General under this section."[70] If the 120-day limit expires, "the district

---

[65] *SW Gen.*, 580 U.S. at 294-95.
[66] 28 U.S.C. § 541(a).
[67] *Id.* §§ 541(b), (c).
[68] 28 U.S.C. § 546(a).
[69] *Id.* § 546(b).
[70] *Id.* §§ 546(c)(1), (2).

court for such district may appoint a United States attorney to serve until the vacancy is filled."[71]

Congress has also enacted a general statute to provide for the temporary execution of the functions and duties of a vacant PAS office: 5 U.S.C. § 3345 (the Federal Vacancies Reform Act or "FVRA"). The FVRA provides that "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity,"[72] or "notwithstanding" the first assistant's assumption of acting status, "the President (and only the President) may direct" either another PAS officer or "an officer or employee of such Executive agency" who "during the 365-day period preceding the [vacancy] . . . served in a position in such agency for not less than 90 days" and held a position with a rate of pay at GS-15 or higher to "perform the functions and duties of the officer temporarily in an acting capacity."[73]

The FVRA also bars from acting service officers who meet one of the above requirements if, "during the 365-day period preceding the [vacancy], such person

---

[71] *Id.* § 546(d).
[72] 5 U.S.C. § 3345(a)(1).
[73] *Id.* §§ 3345(a)(2), (3); *see SW Gen.*, 580 U.S. at 295-96.

. . . did not serve in the position of first assistant to the office of such officer; or . . . served in the position of first assistant to the office of such officer for less than 90 days; and . . . the President submits a nomination of such person to the Senate for appointment to such office."[74] The next subsection "creates an exception to this prohibition, providing that [it] 'shall not apply to any person' serving in a first assistant position that itself requires the Senate's advice and consent."[75]

The FVRA sets a 210-day limit for acting service "beginning on the date the vacancy occurs."[76] If the vacancy exists during "the 60-day period beginning on a transitional inauguration day," the 210-day clock begins 90 days after the vacancy or inauguration day, whichever is later.[77] When the President submits a nomination for the office to the Senate, acting service can continue throughout the pendency of the nomination,[78] and, if the nomination is "rejected . . ., withdrawn, or returned to the President," a new 210-day period of acting service is triggered on the day of the "rejection, withdrawal, or return."[79] A second nomination again tolls the FVRA's clock during its pendency,[80] and the acting officer may serve for a final 210-day period if the second nomination also fails.[81]

---

[74] 5 U.S.C. § 3345(b)(1)
[75] *SW Gen.*, 580 U.S. at 296 (quoting 5 U.S.C. § 3345(b)(2)).
[76] 5 U.S.C. § 3346(a)(1).
[77] *Id.* § 3349a(b).
[78] *Id.* § 3346(a)(2).
[79] *Id.* § 3346(b)(1).
[80] *Id.* § 3346(b)(2)(A).
[81] *Id.* § 3346(b)(2)(B).

The FVRA further provides that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office of an Executive agency . . . unless . . . a statutory provision expressly authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity; or . . . designates an officer or employee" to do the same.[82] The exclusivity provision also makes an exception for recess appointments.[83] Finally, the exclusivity provision explicitly notes that the exception in section 3347(a)(1) for office-specific statutes does not apply to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency."[84]

Last, the FVRA imposes consequences for its violation. It provides that "[u]nless an officer or employee is performing the functions and duties [of a vacant office] in accordance with sections 3345, 3346, and 3347," "the office shall remain vacant" and "only the head of such Executive agency may perform any function or duty of such office."[85] Furthermore, "[a]n action taken by a person who is not acting

---

[82] *Id.* §§ 3347(a)(1)(A), (B).

[83] *Id.* § 3347(a)(2).

[84] *Id.* § 3347(b).

[85] *Id.* §§ 3348(b)(1), (2). "Function or duty" is narrowly defined for purposes of this section, under provisions that I will return to later.

under section 3345, 3346, or 3347," or the head of the Department, "in the performance of a function or duty of a vacant office . . . shall have no force or effect," and "may not be ratified."[86]

## C.    Statutory Interpretation

When interpreting a statute, courts "must begin with the statutory text."[87] Often the plain text will answer the question at hand, and if it does, the analysis ends.[88] "We do not examine the language in isolation, however."[89] "Rather, in examining the statutory language, 'we take account of the specific context in which that language is used, and the broader context of the statute as a whole.'"[90] The Court's duty is to "give effect, if possible, to every clause and word of the statute."[91] If this view of the text provides "plain and unambiguous meaning with regard to the particular dispute in the case[, the] inquiry must cease."[92] Though the text, particularly when viewed in context, will almost always be sufficiently clear to

---

[86]  *Id.* §§ 3348(d)(1), (2).

[87]  *Khan v. Att'y Gen.*, 979 F.3d 193, 197 (3d Cir. 2020) (quoting *A.A. v. Att'y Gen.*, 973 F.3d 171, 180 (3d Cir. 2020)).

[88]  *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).

[89]  *Hayes v. Harvey*, 903 F.3d 32, 41 (3d Cir. 2018).

[90]  *Id.* (quoting *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008)); *Bondi v. VanDerStok*, 145 S. Ct. 857, 875 (2025) (Gorsuch, J.); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)); *see Gundy*, 588 U.S. at 141 (plurality) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

[91]  *Fischer v. United States*, 603 U.S. 480, 486 (2024) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

[92]  *Robinson*, 519 U.S. at 340.

answer the question at hand, resort to "the statutory history [can] reinforce[] that textual analysis."[93]

## III.    DISCUSSION

My analysis generally proceeds in chronological order. First, I consider whether Ms. Habba's tenure as Interim United States Attorney pursuant to 28 U.S.C. § 546, which began on March 28, 2025, lawfully continued until July 24, 2025, when she purported to resign, and conclude that it did not. As I interpret the law, her interim appointment ended on July 1, 2025—120 days after Attorney General Bondi invoked her power under section 546(a) by appointing Mr. Giordano Interim United States Attorney on March 3, 2025. Thus, Ms. Habba was not lawfully acting as the United States Attorney in any capacity from July 1, 2025 until at least July 24, 2025. Second, I analyze whether Ms. Habba lawfully assumed the role of Acting United States Attorney on July 24, 2025, pursuant to 5 U.S.C. § 3345. I conclude that she is not statutorily eligible to perform the functions and duties of the office of the United States Attorney and has therefore unlawfully held the role since July 24, 2025. Third, I review the Government's backstopping argument that Ms. Habba's conduct has nevertheless been permissible because she has been exercising the functions and duties of the office of United States Attorney pursuant to her appointment by the Attorney General as a Special Attorney and the Attorney General's attendant

---

[93]    *Snyder v. United States*, 603 U.S. 1, 12 (2024) (Kavanaugh, J.).

delegation of the powers of a United States Attorney to her in that capacity. I reject that argument. Fourth, I briefly note that, given my statutory rulings, there is no need to reach the Girauds' constitutional claims. Fifth, given the legal and factual complexity of the issues, I set forth a fresh timeline of the relevant events incorporating my legal conclusions. Last, I consider whether my conclusions require dismissal of Mr. Pina's indictment and determine that such relief is not required.

### A.    28 U.S.C. § 546

The defendants have asserted two legal issues with Ms. Habba's tenure pursuant to 28 U.S.C. § 546. First, they contend that the Attorney General is limited to one section 546(a) appointment of an Interim United States Attorney, and that the section 546(a) power does not recur at the end of an appointment.[94] As a result, Ms. Habba's term as Interim United States Attorney ended sometime before her resignation on July 24, 2025. Second, they argue that, once invoked, section 546 becomes the exclusive means for appointing a person to exercise the functions and duties of a United States Attorney in a temporary capacity, displacing the FVRA's acting officer scheme.[95] The defendants are correct on the first issue but not the second.

---

[94]  Doc. 121 (Giraud Supp. Brief) at 9-11; *Pina* Doc. 52-1 (Pina Mot.) at 9-11.
[95]  Doc. 99 at 4; Doc. 121 at 13-15; *Pina* Doc. 52-1 at 11-17.

### 1.    Repeat Appointments

Section 546(a) provides that "the Attorney General may appoint a United States attorney for the district in which the office of the United States attorney is vacant."[96] "A person appointed" under the statute "may serve until the earlier of" the confirmation of a United States Attorney by the Senate, or "the expiration of 120 days after appointment by the Attorney General under this section."[97] The defendants' argument that these provisions preclude Ms. Habba's service takes two flavors: (1) section 546 allows the Attorney General a single appointment of a single person, and when that appointment ends for any reason, the appointing power shifts to the district court under section 546(d); and (2) section 546 allows the Attorney General to make appointments of different individuals, but for an aggregate term of 120 days. The Government interprets the statute to mean that the Attorney General can make unlimited appointments under section 546(a) unless and until one of those appointments reaches the 120-day limit, at which point the appointing power shifts to the district court.[98] I agree with the defendants' second reading.[99]

---

[96]  28 U.S.C. § 546(a).
[97]  *Id.* § 546(c).
[98]  Doc. 127 at 14-15.
[99]  This is an issue of first impression. Only one case appears to note the possibility of repeat appointments, and it suggests that such conduct may be permitted. In *In re Grand Jury Proceedings*, 673 F. Supp. 1138, 1142 n.11 (D. Mass. 1987), the court explained in dicta in a footnote that "[a]lthough the drafters appeared to envision that the district court would act at the expiration of an interim appointment, it is not clear from this Court's reading of the statute, that the Attorney General himself would be foreclosed from making a second interim appointment under subsection (a), though limited in his choice, of course, by subsection (b)."

The defendants' first reading has no basis in the text. The Attorney General has the power to appoint a United States Attorney when the office is vacant.[100] That may occur even if a section 546(a) appointment has already been made, if the original appointee steps down or is removed.[101] The only limitations on appointments and service are those in sections 546(b) and (c), and none even arguably applies to an appointee to a vacant office who has not been rejected as a nominee by the Senate and who is serving less than 120 days after the original appointment.[102] So there is no prohibition on making a personnel change. That reading is confirmed by section 546(c)'s use of the indefinite article "*A*" to describe an appointee to whom the barring provisions apply.[103] Indefinite articles indicate that the thing referred to is nonspecific,[104] and Congress's choice to use an indefinite article here indicates that more than one individual may be the subject of the Attorney General's appointment power, and that whomever is serving at the occurrence of one of the barring provisions is subject thereto.

---

This reasoning is extremely brief and does not purport to be a holding. It is therefore not persuasive.

[100]  *Id.* § 546(a).

[101]  *Id.* § 541(c).

[102]  There is no dispute that Ms. Habba's section 546(a) appointment was made less than 120 days after the Attorney General's first effective section 546(a) appointment of Mr. Giordano.

[103]  28 U.S.C. § 546(c); *see also id.* § 546(d) ("If *an* appointment expires . . .") (emphasis added)..

[104]  *Indefinite*, Oxford English Dictionary (3d ed. 2025) ("Applied to various adjectives, pronominal words, and adverbs, which do not define or determine the actual person or thing, the place, time, or manner, to which they refer."); *id.* (2d ed. 1989) (identical definition).

The defendants' second reading is textually sound. Section 546(c)(2), the 120-day limit, is benchmarked only to "appointment by the Attorney General under this section."[105] It does not refer to "*the person's* appointment." In grammatical terms, there is no article, definite or indefinite, to describe the appointment to which section 546(c)(2) refers. But the text has not left us without guidance. The statute tells us that the 120 days are counted from "appointment by the Attorney General under this section."[106] The Attorney General makes such appointment when she invokes section 546(a). So the 120-day clock begins running when the Attorney General first invokes section 546(a) and makes an appointment.

The Government protests that the appointment referred to in section 546(c)'s "chapeau"—"a person appointed"—should carry through to the "appointment" referred to section 546(c)(2).[107] But that reading strains the text for three reasons. First, it transforms the indefinite article in the chapeau into a definite article or pronoun that is unstated in section 546(c)(2), rewriting the unmodified term "appointment" as "her appointment" or "that appointment."[108] Second, both the chapeau and subsection (c)(2) describe an appointment "under this section."[109] If

---

[105] 28 U.S.C. § 546(c)(2).

[106] *Id.*

[107] Doc. 127 at 14; Doc. 141 at 26:18-25.

[108] *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) (Gorsuch, J.) ("Nor does this Court usually read into statutes words that aren't there. It's a temptation we are doubly careful to avoid when Congress has (as here) included the term in question elsewhere in the very same statutory provision.").

[109] 28 U.S.C. §§ 546(c), (c)(2).

subsection (c)(2)'s bar is limited to the appointment described in (c), then restating "under this section" is redundant because that is the only type of appointment to which it could apply. But courts should give "'every clause and word of a statute' . . . meaning."[110] Giving meaning to the second use of "under this section" indicates that that subsection (c)(2) refers more broadly to *any* appointment "under this section." And third, the chapeau clearly does not modify the other barring provision in section 546(c)(1), which is indisputably benchmarked to an event unrelated to any specific person's interim appointment: Senate confirmation of the President's nominee.[111] Had Congress wanted the 120 day clock to run on a per-appointee basis, it could easily have written the statute to place the bar of subsection (c)(2) first and written it as "the expiration of 120 days after *her* appointment." Congress's choice not to so define the appointment in subsection (c)(2) is meaningful, and the Court will not redraft the text.[112]

Statutory context confirms that the defendants' reading is correct. First, Congress provided next steps for keeping the United States Attorney's office filled when the 120-day clock runs out: section 546(d) permits the district court to step in and make an appointment.[113] Accepting the Government's reading would give the

---

[110] *United States, ex rel. Ploansky v. Exec. Health Resources, Inc.*, 599 U.S. 419, 432 (2023) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

[111] 28 U.S.C. § 546(c)(1).

[112] *Romag Fasteners*, 590 U.S. at 215.

[113] 28 U.S.C. § 546(d).

Executive a permanent means of thwarting that provision by terminating every section 546(a) appointment on its 119th day. Taken to the extreme, the President could use this method to staff the United States Attorney's office with individuals of his personal choice for an entire term without seeking the Senate's advice and consent.[114] But it is a core maxim of statutory interpretation that "[w]e generally avoid construing one provision in a statute so as to suspend or supersede another provision. To avoid 'denying effect to a part of a statute,' we accord 'significance and effect to every word.'"[115] Read together with the alternatives in sections 546(d) and 541(a), there must be some limit to section 546(a) appointments, and the text tells us that the limit is 120 days.

The statute is unambiguous, and my analysis need go no further. But the statutory history also supports the defendants' reading and thus reinforces the textual conclusion.[116] The statute's modern text was enacted in a 1986 amendment.[117] But in 2006, Congress revised section 546 as part of the USA PATRIOT Improvement

---

[114] *See* 28 U.S.C. § 541(a); *see Aviel v. Gor*, No. 25-CV-0778, 2025 WL 2374618, at *10-11 (D.D.C. Aug. 14, 2025) (raising constitutional concerns about acting appointments without a time limit). Even assuming reappointments of the same person would be impermissible, and the Government does not concede as much, the roster of candidates would not need to be extensive. A full term would only require 13 appointments.

[115] *Rake v. Wade*, 508 U.S. 464, 471-72 (1993) (Thomas, J.) (quoting *Ex parte Pub. Nat'l Bank of New York*, 278 U.S. 101, 104 (1928)) (internal alterations omitted).

[116] *Snyder*, 603 U.S. at 12.

[117] Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. No. 99-646, § 69, 100 Stat. 3592, 3616-17 (1986).

and Reauthorization Act of 2005.[118] The 2006 revision entirely removed the 120-day limit and the district court's backstopping role, and simply provided that "[a] person appointed as United States attorney under this section may serve until the qualification of a United States Attorney for such district appointed by the President under section 541 of this title."[119] The switch to an unlimited appointment was short lived. Barely more than a year later, Congress reverted to the pre-PATRIOT Act language.[120] Readdition of the 120-day limit is strong evidence that Congress did not intend to permit that limit to be circumvented by repeat appointments.[121] And, to the extent it is of any use at all, the House Report on the draft 2007 bill identified as a primary concern "Bypassing the Requirement of Senatorial Advice and Consent," which included "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals. For example, one individual received a total of four successive interim appointments."[122]

---

[118] USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006).

[119] *Id.*

[120] Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007).

[121] *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (defining statutory history as "the record of *enacted* changes Congress made to the relevant statutory text over time, the sort of textual evidence everyone agrees can sometimes shed light on meaning" (emphasis in original)).

[122] H.R. Rep. No. 110-58 at 6 (2007); *see Al-Hasani v. Sec'y U.S. Dep't of Homeland Sec.*, 81 F.4th 291, 298 n.4 (3d Cir. 2023) ("[Statutory history] is distinct from legislative history—committee reports and the like—the mining of which is 'disfavored' as a statutory interpretation strategy." (quoting *Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (Willett, J., concurring))).

28

As a final thrust, the Government points to historical practice and contends that Attorneys General have made successive section 546 appointments in the past, and that Congress's 2007 reenactment of the 1986 statutory language, with knowledge of the Executive's practice, indicates its acquiescence in that practice.[123] It is true that "'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,' can 'raise a presumption that the action had been taken in pursuance of its consent,'"[124] but "past practice does not, by itself, create power."[125] In this case, "'historical practice' is too grand a title for the [Government's] evidence."[126]

The Government does not identify how common successive appointments were before the 2007 reenactment, and Congress did not suggest that the practice was widespread.[127] Moreover, the very same Committee that proposed re-adopting the 1986 language identified successive appointments as a primary concern, so the practice is far from being "never before questioned."[128] Inferring Congress's

---

[123]  Doc. 141 at 31:7-24.

[124]  *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)) (internal alterations omitted); *Noel Canning*, 573 U.S. at 525 ("[T]he longstanding 'practice of the government,' can inform our determination of 'what the law is.'" (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803))) (rule of constitutional interpretation).

[125]  *Medellín*, 552 U.S. at 531-32 (quoting *Dames & Moore*, 453 U.S. at 686) (internal alterations omitted).

[126]  *SW Gen.*, 580 U.S. at 308.

[127]  *See* H.R. Rep. No. 110-58 at 6 (2007) (describing "several instances [of] successive interim appointments").

[128]  *Id.* at 13 (draft language); *Medellín*, 552 U.S. at 531 (quoting *Dames & Moore*, 453 U.S. at 686).

acquiescence from a historical record this thin and contradictory is simply untenable. At bottom, any post-enactment practice is not consistent with the unambiguous text of section 546, and the text must control.[129]

Based on the text, context, and statutory history of section 546, the Attorney General is vested with 120 total days to appoint an Interim United States Attorney from the date that she first invokes section 546(a). Termination of an appointment before the 120-day deadline does not allow another 120-day term. Accordingly, the section 546(c)(2) bar triggered to end Ms. Habba's appointment as Interim United States Attorney for the District of New Jersey on July 1, 2025, 120 days after Ms. Bondi appointed Mr. Giordano Interim United States Attorney on March 3, 2025. As a result, Mr. Habba was acting without authority when she signed Mr. Pina's indictment on July 7, 2025, so the indictment is presumptively defective.[130]

### 2. Exclusivity

The defendants argue that once the section 546(c)(2) bar is triggered, "the exclusive authority to appoint an interim U.S. Attorney shifts unequivocally to the District Court" under section 546(d).[131] The Government responds that the FVRA

---

[129] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022) (rule of constitutional interpretation).

[130] Fed. R. Crim. P. 7(c)(1) (requiring that indictment be "signed by an attorney for the government").

[131] Doc. 99 at 4; Doc. 121 at 13-15; *Pina* Doc. 52-1 at 11-17.

remains a viable option for temporarily filling the United States Attorney role in such cases.[132] I agree with the Government.

There is no textual basis for concluding that, once triggered, section 546(d) is the exclusive means for appointing a United States Attorney until a PAS official is confirmed. Section 546 contains no exclusivity provision. And the FVRA's exclusivity provision, 5 U.S.C. § 3347(a), contains an exception for "a statutory provision [that] expressly . . . authorizes the President, a court or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity.[133] The FVRA's provision does not say that in such cases, the office-specific provision shall be exclusive of the FVRA.

Lacking a textual hook, the defendants contend that section 546 becomes exclusive once invoked because, as the office-specific statute, it controls over the FVRA's general provisions.[134] It is true that the general/specific canon "has full application . . . to statutes . . . in which a general authorization and a more limited specific authorization exist side-by-side."[135] But the purpose of the rule in such cases is to avoid "the superfluity of a specific provision that is swallowed by a general

---

[132]  Doc. 108 at 15-20; Doc. 127 at 10-12.
[133]  5 U.S.C. § 3347(a)(1).
[134]  *See Pina* Doc. 52-1 at 12 (citing authority for the general/specific canon).
[135]  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

one."[136] If "the specific provision embraced within a general one is not superfluous," there is no need to apply the canon.[137] Retaining the FVRA does not render section 546 superfluous for several reasons.

First, the statutes provide different incentives and consequences. Any person can be appointed an Interim United States Attorney under section 546(a), but only for 120 days.[138] Under the FVRA, only a limited set of individuals can perform the functions and duties of a vacant office in an acting capacity,[139] but can do so for a longer period that is subject to significant extensions.[140] So the President and Attorney General may wish to use one or the other depending on the situation.

Second, reverting to the FVRA scheme after a section 546(a) appointment makes logical sense. The FVRA's timelines are triggered by the occurrence of the vacancy, and do not depend on whether someone is performing the functions and duties of the office.[141] So the section 3346 clock continues to run even if the vacant office is held in an interim capacity under a position-specific statute like section 546. If a section 546(a) appointment expires before the section 3346 clock has run, there is no basis for excluding the remaining time under the FVRA. Moreover, there are several situations in which no one will hold the office under section 546, and in those

---

[136] *Id.* (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).
[137] *Id.* at 646-47.
[138] 28 U.S.C. § 546(c)(2).
[139] 5 U.S.C. § 3345(a).
[140] *Id.* § 3346.
[141] *Id.* § 3346(a)(1) (starting 210-day clock on "the date the vacancy occurs").

cases, assuming that there is still time left under section 3346, it makes sense to permit a person to take acting status. Those situations include: (1) the expiration of section 546(a) appointments under section 546(c)(2) and District Court declination to use its permissive section 546(d) power;[142] or Presidential termination of a section 546(d) appointee pursuant to section 541(c).[143] In those cases, the Executive may wait for the District Court to act (or do so again) or it may invoke section 3345(a)(2) or (a)(3) to temporarily fill the role.

Finally, applying the FVRA after a section 546(a) appointment does not render section 546(d) superfluous. There is no time limit on when the District Court may use its section 546(d) power.[144] If the time limits on the FVRA run out, "the office shall remain vacant,"[145] but position-specific statutes remain viable alternatives to fill the role on a temporary basis.[146] At that point, the District Court—and only the District Court—may act to temporarily appoint a United States Attorney.[147] This conclusion accords with those of other courts to have considered the interaction between the FVRA and position-specific statutes.[148]

---

[142] 28 U.S.C. §§ 546(c)(2), (d); *see United States v. Gantt*, 194 F.3d 987, 1000 (9th Cir. 1999) ("The judicial branch is not required to appoint a United States Attorney; it is simply empowered to do so.").

[143] 28 U.S.C. § 541(c) ("Each United States attorney is subject to removal by the President.").

[144] *Id.* § 546(d).

[145] 5 U.S.C. § 3348(b)(1).

[146] *Id.* § 3348(b) (providing that the "remain vacant" rule applies only if there is not a section 3347 option for performing the functions and duties of the vacant office).

[147] 28 U.S.C. § 546(d).

[148] *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) ("[N]either the FVRA nor the NLRA is the exclusive means of appointing an Acting General Counsel of the

Legislative history reinforces this interpretation of the text. In enacting the current version of section 546, Congress considered adding a provision making section 546 "the exclusive means for appointing a person to temporarily perform the functions of a United States attorney for a district in which the office of United States attorney is vacant," but that provision was removed from the final version of the bill.[149] That deletion "strongly militates against a judgment that Congress intended a result that it expressly declined to enact."[150]

Based on the text of section 546 and the FVRA, I conclude that section 546 appointments do not displace the FVRA as an alternative means of temporary appointment.

### B.    5 U.S.C. § 3345 *et seq.*

Because the FVRA was a viable option for filling the vacant office of United States Attorney for the District of New Jersey at the time that the Executive invoked it, I turn to that provision next. The defendants contend Ms. Habba is not lawfully serving as the Acting United States Attorney because her appointment violates two

---

NLRB. Thus, the President is permitted to elect between these two statutory alternatives to designate an Acting General Counsel."); *United States v. Patara*, 365 F. Supp. 3d 1085, 1088-91 (S.D. Cal. 2019); *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 356 F. Supp. 3d 109, 138-44 (D.D.C. 2019) *aff'd*, 920 F.3d 1 (D.C. Cir. 2019); *English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018) ("[T]he FVRA's exclusivity provision makes clear that it was generally intended to apply alongside agency-specific statutes, rather than be displaced by them.").

[149] H.R. Rep. No. 110-58 at 13 (2007).

[150] *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 200 (1974); *see Lora v. United States*, 599 U.S. 453, 463 n.6 (2023); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 787 (1984).

provisions of the FVRA. First, they argue that a first assistant may assume a vacant office in an acting capacity under section 3345(a)(1) only at the moment that the vacancy occurs, and that a person who takes the first assistant office during the vacancy's pendency does not take the acting role in the vacant office.[151] Second, they assert that section 3345(b)(1) prohibits Ms. Habba from taking the acting role because she previously was nominated by the President to fill the vacant office.[152] The Court agrees with the defendants on the first issue and, having found that Ms. Habba's appointment violates the FVRA, does not reach the second.

### 1.    First Assistant Eligibility

The FVRA provides that "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," . . . "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity."[153] "Notwithstanding" the performance of those functions and duties by the first assistant, "the President (and only the President) may direct" either another

---

[151] Doc. 121 at 15-17; *Pina* Doc. 52-1 at 17-27.

[152] Doc. 99 at 3; Doc. 121 at 17-19; *Pina* Doc. 52-1 at 28-32. Mr. Pina also asserts a third argument which I do not reach. *Pina* Doc. 52-1 at 27-28.

[153] 5 U.S.C. §§ 3345(a), 3345(a)(1). I note that the FVRA's definition of a vacancy precludes any argument that Ms. Habba's resignation as the Interim United States Attorney created a new vacancy that retriggered section 3345(a), because, as Interim United States Attorney, Ms. Habba was not "an officer . . . whose appointment to office [was] required to be made by the President, by and with the advice and consent of the Senate." *Id.* § 3345(a).

PAS officer or another employee of the same agency who worked in that agency for at least 90 days in the year before the vacancy and is paid at a GS-15 level "to perform the functions and duties of the vacant office temporarily in an acting capacity."[154] This statutory framework convincingly indicates that a "first assistant" who may take office in an "acting capacity" must be the first assistant at the time the vacancy occurs.[155]

First, the vacancy provision and the first assistant provision function in a simple if-then form, indicating that the promotion of the first assistant occurs

---

[154] *Id.* §§ 3345(a)(2)-(3)

[155] This is an issue of first impression. Several courts have noted the possibility of this interpretation, but none has resolved the question either way. *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) *aff'd*, 580 U.S. 288 (2017) ("Although we do not decide its meaning today, subsection (a)(1) may refer to the person who is serving as first assistant when the vacancy occurs. *Accord* 23 Op. O.L.C. at 64 ('[W]e believe ... you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant.'). Under this reading, subsection (a)(1) provides a default rule that automatically promotes someone (the current first assistant) to be the acting officer without a break in service and without action by the President."); *Hooks*, 816 F.3d at 560 ("If (b)(1) applies only to (a)(1), which refers only to first assistants, then (b)(1)'s reference to persons who 'did not serve in the position of first assistant to the office of such officer,' 5 U.S.C. § 3345(b)(1)(A)(i), would be, as the D.C. Circuit recognized, 'inoperative because the current first assistant necessarily served as the first assistant in the previous year.'" (quoting *SW Gen.*, 796 F.3d at 76)); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020) ("[T]he parties focus their arguments on the question whether, as Plaintiffs contend, . . . the first-assistant default rule applies only to individuals serving as first assistants at the time the vacancy arises or, as Defendants contend, . . . the default rule also applies to individuals first appointed to the position of first assistant after the vacancy in the PAS office arises. That dispute poses a difficult question that the Office of Legal Counsel has answered differently at different times, . . . and that the courts have not had the occasion to resolve, . . . . Now is not the time to resolve that question . . . ." (citing *SW Gen.*, 796 F.3d at 76)); *cf. Williams v. Phillips*, 360 F. Supp. 1363, 1370 n.11 (D.D.C. 1973) (reasoning in dicta that one could not become an acting officer if they were named the first assistant after the vacancy under precursor statute to FVRA); *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 63-64 (1999) ("[W]e believe that the better understanding is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant.").

automatically at the moment of the vacancy.[156] Subsection (a) provides the triggering condition—when the last PAS officer "dies, resigns, or is otherwise unable to perform the duties of the office"[157]—and subsection (a)(1) sets the mandatory condition that follows—"the first assistant to the office of such officer shall perform the functions and duties."[158] This immediate action is confirmed by the vacancy provision's use of present tense verbs ("dies, resigns, or is otherwise unable to perform").[159] There is no textual indication that the President has any choice in invoking the first assistant provision, nor that it is meant to trigger at any time other than the moment that the vacancy occurs.

That reading is confirmed by the text of the next two provisions of the statute. Subsections (a)(2) and (a)(3) both provide that "notwithstanding" the first assistant's automatic promotion, the President may choose someone else to fill the role.[160] The use of "notwithstanding," indicates that subsection (a)(1) triggers whether the

---

[156] *SW Gen.*, 580 U.S. 288, 295 (2017) ("Subsection (a)(1) prescribes a general rule: If a person serving in a PAS office dies, resigns, or is otherwise unable to perform his duties, the first assistant to that office "shall perform" the office's "functions and duties ... temporarily in an acting capacity."); *id.* at 305 (describing (a)(1) as "automatic[]"); *Hooks*, 816 F.3d at 557 ("As described in (a)(1), 'the first assistant to the office' automatically fills the vacancy as an acting officer unless someone else is appointed."); *SW Gen.*, 796 F.3d at 71 ("The FVRA provides that, in the event of a vacancy in a PAS position, the 'first assistant' automatically takes over in an acting capacity.").

[157] 5 U.S.C. § 3345(a).

[158] *Id.* § 3345(a)(1).

[159] *Id.* § 3345(a). The present verb tense stands in contrast to the present perfect tense, which "conveys to a listener that the event in question continues to be true or valid." *Hewitt v. United States*, 605 U.S. __, 145 S. Ct. 2165, 2173 (2025).

[160] 5 U.S.C. §§ 3345(a)(2), (3).

President wishes it to or not, and he may merely override it.[161] Furthermore, the fact that subsections (a)(2) and (a)(3) provide that the President "may direct" someone else to fill the role stands in clear contradistinction to subsection (a)(1)'s rule that the first assistant "shall perform" the functions and duties of the office.[162] Comparing the provisions' subjects also confirms this reading. Subsection (a)(1) refers only to the "first assistant" and does not mention any other person, while (a)(2) and (a)(3) both feature "the President (and only the President)" as the subject. The sum of these considerations is that the first assistant provision textually provides that the first assistant automatically begins performing the functions and duties of the vacant office in an acting capacity at the moment the vacancy occurs. Neither the President nor anyone else has a role in this process.

Statutory context also supports the reading that the Executive may not appoint a first assistant after the vacancy and have that person begin performing the functions and duties of the vacant office under subsection (a)(1). Applying the Government's

---

[161] *Hooks*, 816 F.3d at 557 ("Signaled by the phrase 'notwithstanding paragraph (1),' the statute goes on to provide two ways the President may override the automatic operation of (a)(1)."); *SW Gen.*, 580 U.S. at 301 (explaining that "[t]he ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'").

[162] *SW Gen.*, 580 U.S. at 303-04 ("Compare the mandatory language of subsection (a)(1) to (a)(2) and (a)(3). People appointed under those provisions are just as much acting officers as first assistants who assume the role. But there is no freestanding directive that they perform acting duties; subsections (a)(2) and (a)(3) just say that the President 'may direct' them to do so. . . . Subsections (a)(2) and (a)(3) are each preceded by the phrase 'notwithstanding paragraph (1).' The phrase recognizes that subsection (a)(1) is unique, and resolves the potential conflict between the mandatory 'shall perform' in that provision and the permissive 'may direct' in (a)(2) and (a)(3).").

38

reading would render the limits in subsections (a)(2) and (a)(3) surplusage in the vast majority of cases.[163] Those provisions set a very high bar for the President's options for a non-first-assistant acting official: either a person who has already been confirmed by the Senate to another position, or a person who worked in the relevant agency for at least 90 days before the vacancy and was paid at the GS-15 level.[164] But if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, these limitations on acting service are rendered entirely irrelevant.[165] On that reading, the President is free to select someone from outside the Government, with no experience in the relevant agency, and immediately imbue them with the functions and duties of a PAS office. That is what happened here. Moreover, the First Assistant United States Attorney role is not named by the President,[166] so reading (a)(1) to permit subsequent appointees to take the Acting role would also render the "President (and only the President)" language

---

[163] *Feliciano v. Dep't of Transp.*, 605 U.S. __, 145 S. Ct. 1284, 1302 (2025) (Thomas, J., dissenting) ("Because we interpret statutes, where possible, to avoid superfluity, we strive to avoid interpretations that 'would in practical effect render statutory language entirely superfluous in all but the most unusual circumstances.'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001))); *Milner v. Dep't of Navy*, 562 U.S. 562, 575 (2011) (quoting *TRW Inc.*, 534 U.S. at 31).

[164] 5 U.S.C. §§ 3345(a)(2), (3); *see Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 11 (D.C. Cir. 2019).

[165] *See L.M.-M.*, 442 F. Supp. 3d at 28-29 (describing the three methods of appointing Acting officers and reasoning that allowing the agency head to create new post-vacancy offices and designate them first assistants to assume acting status "would decimate this carefully crafted framework").

[166] 28 C.F.R. § 0.137(b) ("Where there is no position of Principal Deputy to the PAS office, the First Assistant shall be the person whom the Attorney General designates in writing.").

of sections (a)(2) and (a)(3) surplusage in this case and every other instance where the first assistant is not named by the President.[167]

The Government responds with two arguments. First, it contends textually that the first assistant provision refers to the first assistant "to the office of such officer,"[168] and thus contemplates that a first assistant can fill the acting role in an already vacant office, as opposed to immediately following the last PAS "officer."[169] That argument fails textually. The phrase "office of such officer" can just as easily be read as a definition for "first assistant"—one that demonstrates that it is a term of art which refers to the agency's formal hierarchical structure as opposed to an ordinary meaning interpretation which would suggest that the phrase merely refers to the person on which the outgoing officer relied most heavily.[170] Moreover, even reading the phrase "office of such officer" to refer to the vacant office does not alter my interpretation of the function of subsection (a)(1), because the office must become vacant for at least a moment before the first assistant begins performing its

---

[167] *See L.M.-M.*, 442 F. Supp. 3d at 28.

[168] 5 U.S.C. § 3345(a)(1).

[169] Doc. 127 at 4; *see Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-80 (2001) (asserting the same argument). Notably, the only other argument that this OLC opinion asserts for its reading of section 3345(a)(1) is contradicted by the holding of *SW Gen.*, 580 U.S. 288.

[170] *See* 144 Cong. Rec. 22525 (statement of Sen. Lieberman) ("As the bill is currently drafted, only one of two individuals can serve as acting officials in the case of a vacancy: Either the first assistant to the vacant position, a term of art that generally refers to the top deputy. . . ."); *but see L.M.-M.*, 442 F. Supp. 3d at 24-26 (reading the first assistant provision to refer to someone who "serve[d] in a subordinate role—that is, as an 'assistant'—to any other [agency] official.").

functions and duties.[171] The Government's reading does not change the timing of subsection (a)(1)—which is determined by subsection (a)—nor indicate that it should retrigger at some later point. In light of the textual arguments cutting the other direction, this argument is unpersuasive.

The Government's second contention is that their reading does not render subsections (a)(2) and (a)(3) surplusage or ineffective in cases where the first assistant position is also a PAS office and is also vacant at the moment the primary office becomes vacant.[172] The coincidence of those two circumstances will undoubtedly be "unusual," and therefore the Government's argument does little to assuage my concerns about surplusage.[173] Moreover, had Congress wished to cabin subsections (a)(2) and (a)(3) to PAS first assistants, it could have said so using much clearer terms than the several layers of implication required to make sense of the Government's reading.[174] Instead, it made these two provisions exceptions to a subsection that applies to each and every first assistant who performs the functions and duties of a vacant PAS office.[175]

---

[171] 5 U.S.C. §§ 3345(a), (a)(1).

[172] Doc. 127 at 6; Doc. 142 at 3.

[173] *TRW Inc.*, 534 U.S. at 29; *see L.M.-M.*, 442 F. Supp. 3d at 29.

[174] *See* 5 U.S.C. § 3345(b)(2) (clearly stating that an exception applies to PAS first assistants).

[175] The Government also contends that subsection (a)(1)'s lack of a backwards-looking eligibility requirement, like those in subsections (a)(3)(A) and (b)(1)(A)(ii), cuts against this reading. But eschewing a pre-vacancy service requirement makes sense for a first assistant automatically taking office because of the risk that an unexpected event, like a death, could trigger a vacancy. In such a case, the first assistant will perform the functions and duties of the office even if he was only appointed a few days earlier. But to pick a different career officer, or to offer the first assistant as the nominee, additional service requirements are logical.

Even accepting the Government's arguments, I would go no further than to find the statutory text ambiguous as to this issue. In that case, a court should "prefer 'the most natural reading' of a statute, one that "harmonizes the various provisions in [it] and avoids the oddities that [a contrary] interpretation would create."[176] The defendants' reading creates far more harmony between the FVRA's provisions than the Government's reading, which would find a major loophole in subsection (a)(1) permitting an end-run around every one of the limitations included in subsections (a)(2) and (a)(3) in most instances.[177]

Furthermore, the FVRA's legislative history supports this reading.[178] First, the "automatic" understanding of first assistant promotion is repeated *ad nauseum*

---

[176] *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 58 (1st Cir. 2021) (quoting *Rep. of Sudan v. Harrison*, 587 U.S. 1, 15 (2019) (Alito, J.)); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 147 (2017) (unanimous, Roberts, C.J., recused) ("Whenever possible, however, we should favor an interpretation that gives meaning to each statutory provision." (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[177] *See County of Maui, Haw. v. Haw. Wildlife Fund*, 590 U.S. 165, 179 (2020) ("That Maui's proffered interpretation would also create a serious loophole in the permitting regime also indicates it is an unreasonable one."); *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 168 (1964) (reasoning that proffered interpretation "would be illogical and disrespectful of the plain congressional purpose in amending [a statute] for it would create a large loophole in a statute designed to close a loophole." (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 343 (1963))).

[178] The Government argues that the Senate Report should be discarded because the bill's draft language at the time did not include the final statute's "office of such officer" language on which it relies. *See* Doc. 142 at 4 (citing S. Rep. No. 105-250 at 25 (1998)). But other legislative history suggests that the ultimate statutory language was already in legislators' minds and comported with the Senate Report's draft language. *See* S. Rep. No. 105-250 at 12 ("[First assistant] has a long history of use in the Vacancies Act. As under current law, the term 'first assistant' is used to refer to the first assistant to the 'officer.' However, the practice under current law, which would be continued by this bill, is that the first assistant is actually the first assistant to the vacant office."). This language is concededly unclear, but it implies a definition similar to my reading of the "office of such officer" phrase. To the extent the Senate Report is unreliable, my textual analysis controls and is definitively against the Government.

throughout the Senate Report.[179] The report also clearly contemplates that the first assistant provision only functions in its automatic form at the moment the vacancy occurs, and does not repeat,[180] and suggests that the President has no role in that process.[181] The report emphasizes the value of the first assistant's experience and independence, severely undercutting the idea that the President can hand pick a first assistant with the express purpose of installing them in the acting role.[182]

Moreover, the first assistant's automatic assumption of the functions and duties of the vacant office is contrasted against what happens "[i]f there is no first assistant, or if the President following the assumption of acting status by the first assistant, but within the time limits prescribed by section 3346 so chooses, the President (and only the President) may direct a person who has already received Senate confirmation for another position to perform the functions and duties of the office temporarily in an acting capacity, subject to the time limits of section 3346 . . . . *If there is no first assistant, no one is permitted by law to become an acting*

---

[179] S. Rep. No. 105-250 at 12, 13 ("Notwithstanding *a first assistant on the day of the vacancy's automatic[ally] functioning as the acting officer . . . .*" (emphasis added)).

[180] *Id.* at 12 ("When a vacancy arises, the bill provides an exclusive set of procedures that may be followed. *If the vacant officer has a first assistant*, the first assistant performs the functions and duties of the office temporarily in an acting capacity." (emphasis added)).

[181] *Id.*; *see id.* at 14-15 ("Even if there is no first assistant, and the President declines to designate a Senate-confirmed person to be the acting person, the 150-day period begins to run.").

[182] *Id.* at 12 ("The Vacancies Act provides for the automatic performance of the functions and duties of the vacant office by the first assistant because such person is often a career official with knowledge of the office or a Senate-confirmed individual, and the Committee believes that the routine functions of the office should be allowed to continue for a limited period of time *by that one person*." (emphasis added)); *see also id.* at 31 (additional view).

*officer until the President designates a Senate-confirmed individual to be the acting officer.*"[183]

As a final piece of evidence in support of the defendant's reading, the FVRA's purpose is clearly stated and affirmed by both the majority and minority of the Senate Committee and the Supreme Court.[184] As the majority explained, "[i]n recent decades, the Department of Justice has argued that its advise and consent positions are not covered by the Vacancies Act," and has instead argued that its general delegation

> authority supersedes the Vacancies Act's restrictions on temporarily filling vacant advice and consent positions, allowing for designation of acting officials for an indefinite period, even without submitting a nomination to the Senate to fill the position on a permanent basis. This interpretation of the law is wholly lacking in logic, history, or language, as evidenced by repeated opinions of the Comptroller General.[185]

Given the Executive's refusal to comply with the Appointments Clause, the committee determined that corrective legislation was necessary:

> If the Constitution's separation of powers is to be maintained, and officers of the government subjected to the scrutiny of the Senate for the benefit of the liberty of the people, legislation to address the deficiencies in the operation of the current Vacancies Act is necessary.

---

[183] *Id.* at 13 (emphasis added); *see id.* at 12-13; *id.* at 35 (minority view) ("In addition, the lack of a first assistant to a particular office that becomes vacant would leave the position vacant until such time as the President designates a previously Senate-confirmed official to temporarily fill that vacancy as an acting official.").

[184] *SW Gen.*, 580 U.S. at 293-95 (describing history of vacancies acts and portraying the FVRA as a Congressional response to "a threat to the Senate's advice and consent power").

[185] S. Rep. No. 105-250 at 3; *id.* at 30 (additional view) ("For too long, the Executive Branch's interpretation and implementation of [the Vacancies Act] have stripped it of its original intent and, on occasion, effectively deprived the Senate of its constitutional right to partake in the appointment of a number of Federal officers."); *id.* at 34 (minority view).

The 1988 legislation unfortunately has not succeeded in encouraging presidents to submit nominees in a timely fashion, and it has not resulted in the Justice Department's agreement that is covered by the Act.[186]

As far as it is useful, this legislative history confirms what the text makes clear. In enacting the FVRA, Congress severely limited the options for who may perform the functions and duties of a vacant PAS office.[187] A statutory interpretation that opens a gaping loophole in this tightly crafted scheme meant to provide only limited flexibility and prevent "manipulation" flies in the face of the goal that Congress was trying to accomplish. Although clearer text could require such a result, the Government's arguments reaching such a conclusion through vague implication must fail.

The Government does not give up there, however. As before, it asserts that historical practice cuts in favor of its interpretation because post-vacancy-appointed first assistants have taken the acting role before, and warns that grave consequences will follow from adopting the defendants' reading of the statute.[188] I find the Government's practice-based argument particularly unconvincing in the context of the FVRA. Congress enacted the FVRA *exactly because* the Executive's practice had been to avoid application of the prior Vacancies Act by interpreting its

---

[186] *Id.* at 5; *see id.* at 8 ("In short, in light of various administrations' noncompliance with the Vacancies Act and a recent court decision undermining its operation, it is imperative that Congress enact legislation to restore constitutionally mandated procedures that must be satisfied before acting officials may serve in positions that require Senate confirmation.").

[187] 5 U.S.C. § 3345(a).

[188] Doc. 127 at 6.

provisions narrowly and other statutes broadly.[189] And when Congress had tried to fix similar problems before, the Executive had been just as noncompliant.[190] So resorting to Executive practice following the FVRA is unlikely to show anything other than the Executive's preferred interpretation of the language, and that is shaky evidence of what *Congress* intended. At bottom, the Supreme Court has advised that "historical practice" under the FVRA is not particularly useful, given that "the FVRA was not enacted until 1998."[191] That is all the truer here, where the Executive has only produced anecdotal evidence of post-vacancy-appointed first assistants, unlike in *National Labor Relations Board v. SW General, Inc.* where the NLRB came up with at least 112 examples of its practice.[192]

I am also unmoved by the Government's consequentialist argument. It explains that the Presidential practice has been to appoint first assistants at noon on a transitional Inauguration Day to perform the functions and duties of offices that are vacant due to resignations that predated the Inauguration.[193] Adopting the defendants' reading, it warns, would hamstring incoming administrations, forcing them to temporarily staff PAS offices with holdover officials from their

---

[189] *SW Gen.*, 580 U.S. at 295 ("But tensions did not ease. By 1998, approximately 20 percent of PAS offices in executive agencies were occupied by 'temporary designees, most of whom had served beyond the 120–day limitation period . . . without presidential submissions of nominations.' These acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes." (internal citation omitted)).

[190] *Id.* at 294-95.

[191] *Id.* at 308 (alterations omitted).

[192] *Id.*; *see Guedes*, 356 F. Supp. 3d at 143 n.9.

[193] Doc. 127 at 6.

predecessors. But the vacancy-creating resignations are also a matter of practice—not law—and are offered as a courtesy to the incoming administration. So long as the courtesy continues, it should make little difference to an outgoing administration to delay its officers' resignations until very shortly after Inauguration Day, thereby permitting the incoming President to install his desired first assistants *before* the vacancies.

Finally, it is worth noting that practice is a fickle thing. A government operating by handshake and mutual understanding may go along swimmingly, but only for so long as everyone is willing to play by the rules. Those rules are the result of good-faith compromise—a concession by one branch is premised on the understanding that another branch will not abuse the benefit. So even if a practice of making exceptions to the letter of the law exists, it is likely cabined by other practice-based rules that limit the scope of those exceptions. When one side decides that the practice-based limits no longer apply, what then? May that party take all the benefits of past practice with none of the concessions? In such a situation, recourse to the law—with no atextual exceptions—provides the only answer.

Accordingly, I conclude that Ms. Habba was ineligible to assume the functions and duties of the office of the United States Attorney for the District of New Jersey on July 24, 2025, because she was not the first assistant when the vacancy occurred upon Mr. Sellinger's resignation on January 8, 2025. Therefore,

Ms. Habba may not participate in the defendants' prosecutions going forward as the "Acting United States Attorney."

### 2.    Nomination Bar

The defendants also argue that Ms. Habba is barred from serving as Acting United States Attorney under 28 U.S.C. § 3345(b)(1) because she did not serve as the first assistant for at least 90 days before the vacancy and the President nominated her for appointment to the office. I do not reach this argument and offer no opinion on it because I have already concluded that Ms. Habba is barred from service under a different provision of the FVRA.

### C.    Special Attorney

I have determined that Ms. Habba's appointment to be Acting United States Attorney is unlawful. Undeterred, the Government responds that she may still perform the functions and duties of the office of the United States Attorney through her appointment as a Special Attorney vested with the powers of a United States Attorney pursuant to statutes generally vesting all of the duties of the Department of Justice in the Attorney General and granting the Attorney General power to delegate all of her duties. I proceed by (1) describing the contours of this theory, and then explain why I conclude that it is not viable because: (2) the scope of the delegation is commensurate with the powers of a PAS United States Attorney; (3) the Government's maneuver is prohibited by the FVRA's exclusivity provision, 5 U.S.C. § 3347(b); and (4) the general vesting and delegation statutes cannot bear the

specific type of delegation claimed here. Because the Government argues vehemently that section 3347(b) does not apply, subsection (3) below is further suborganized.

### 1.    Overview

The duties of a United States Attorney are set forth by statute.[194] And a separate statute vests in the Attorney General "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice."[195] Additionally, the Attorney General is independently authorized to "supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."[196] The Attorney General is also empowered to "appoint attorneys to assist United States attorneys when the public interest so requires."[197] Last, a final pair of statutes empowers the Attorney General to "make such provisions as [s]he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General,"[198] and authorize "any attorney specially appointed by the

---

194 28 U.S.C. § 547.
195 28 U.S.C. § 509 (noting exceptions not relevant here).
196 28 U.S.C. § 519.
197 28 U.S.C. § 543.
198 28 U.S.C. § 510.

Attorney General under law . . . [to] conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct."[199]

Taking all of these statutes together, the Government argues that, regardless of sections 546 and 3345, Ms. Habba was appointed a Special Attorney pursuant to section 515 (or section 543, or both), named First Assistant United States Attorney for the District of New Jersey, and in those capacities delegated the Attorney General's power to "conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal . . . which United States Attorneys are authorized to conduct."[200] Through this appointment and delegation, the Government contends that Ms. Habba may "at a minimum . . . supervise th[ese] case[s]."[201]

### 2.    Scope of Delegation

At the outset, it is important to understand what powers the Government has delegated to Ms. Habba in her capacity as a Special Attorney. Although the Government has downplayed the delegation in some of its briefing, a full view of the record demonstrates that the Government intends for its delegation to confer upon Ms. Habba the full panoply of powers of a PAS United States Attorney.

---

[199] 28 U.S.C. § 515.
[200] Doc. 108 at 24-26 (citing Docs. 108-5, 108-7).
[201] *Id.* at 24; *see generally* Doc. 114.

In its briefing, the Government has at times characterized the delegation as a simple delegation of modest powers intended to achieve administrative continuity. In its merits brief, for example, the Government contends that "an official delegated the functions of a U.S. Attorney is [not] equivalent to an official actually serving as a U.S. Attorney."[202] Moreover, the Government repeatedly focuses on Ms. Habba's power to "conduct and supervise litigation in the District of New Jersey" and how that delegation applies in these cases.[203] The Government contends that there is a meaningful distinction between serving as a "Acting officer" pursuant to the FVRA, which allows an official to perform "all functions associated with an office on par with an official who actually occupies that office, including any nondelegable functions of the office," and "being delegated functions that are *not* exclusive to the office of U.S. Attorney."[204] The narrow delegation that the Government describes is not consistent with their arguments about Ms. Habba's powers or the way that Ms. Habba was delegated her duties.

According to Ms. Habba's appointment letter, she has been vested with the authority "to conduct in the District of New Jersey, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct."[205] The

---

[202] Doc. 127 at 22.
[203] *Id.* at 17.
[204] *Id.* at 17-18.
[205] Doc. 108-6.

letter does not purport to limit Ms. Habba's authority to particular cases or issues, nor has the Government ever indicated that Ms. Habba would lack authority to supervise any matter at all. Instead, they have repeatedly taken the opposite position. The Government has indicated that, as Special Attorney, Ms. Habba was "directed to supervise the USAO-NJ."[206] That delegation includes "the authority to supervise all pending prosecutions and other matters in the USAO-NJ."[207] This level of delegation is consistent with the full suite of a United States Attorney's statutory duties.[208] Furthermore, although the Government identifies duties that may hypothetically be exclusive to the office of the United States Attorney,[209] when faced with the prospect of one of these duties being declared exclusive, the Government refused to make any concession.[210] The Government said it best: under the

---

[206] Doc. 108 at 2.

[207] *Id.* at 10, 24; Doc. 127 at 2, 15, 17 ("[S]he would be able to exercise prosecutorial and supervisory authority in the District of New Jersey pursuant to her position as Special Attorney and FAUSA and the Attorney General's express delegation of authority to her in those capacities.").

[208] 28 U.S.C. § 547.

[209] Doc. 127 at 22-23 (citing authority suggesting that 18 U.S.C. § 3731 and 26 U.S.C. § 6103(i)(1)(B) involve duties exclusive to the United States Attorney); *see* Doc. 141 at 119:10-16 (noting that "there are relatively few exclusive functions that are identified under the United States Code").

[210] Doc. 141 at 110:15-22; *see id.* at 103:14-15 ("[W]e've delegated her—*not necessarily all* the functions . . ." (emphasis added)). The Government's vesting and delegation argument does not appear to embrace the idea that a United States Attorney has *any* exclusive powers. *See* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice . . . are vested in the Attorney General."); *id.* § 510 ("The Attorney General may . . . authoriz[e] the performance by any other officer, employee, or agency of the Department of Justice any function of the Attorney General."). *See* Doc. 114 at 4-5.

delegation theory, "Ms. Habba can do ***anything*** the United States Attorney can do."[211]

Additionally, the Government has reiterated the position that "Ms. Habba is the person the President wishes to head the Office of the United States Attorney for the District" of New Jersey.[212] And it is no mere coincidence that Ms. Habba was named a Special Attorney and delegated this authority as part of a single series of moves made with the express goal of installing her as the Acting United States Attorney.[213] It is clear from the record that the Attorney General is using her power of delegation to make Ms. Habba the United States Attorney.[214]

Finally, I reject the Government's contention that I should take a narrow view of how the delegation applies in these cases alone.[215] Such a myopic perspective obscures the validity of the delegation in the first place by ignoring its full scope.

---

[211]  Doc. 114 at 4 (emphasis and bolding in original).

[212]  Doc. 141 at 145:1-4, 147:16-21 ("[T]he Executive Branch has made very clear whom they wish to be in charge of my office. That is Alina Habba . . . That is a choice, and the Executive Branch has made that very clear.").

[213]  Doc. 108-7 (naming Ms. Habba a "Special Attorney" and "designat[ing] her as First Assistant United States Attorney for the District of New Jersey . . . [in which position she] will have authority to serve as Acting United States Attorney.").

[214]  Additionally, I am not blind to the fact that other officials in this administration are purporting to exercise the powers of a United States Attorney pursuant to this theory of delegation, which undermines the idea that Ms. Habba's delegation is a simple administrative necessity. *See* Letter from John A. Sarcone III to Chief Judge Brenda K. Sannes (July 14, 2025), available at https://www.nynd.uscourts.gov/news/inquiries-regarding-designation-john-sarcone-be-acting-us-attorney-ndny (including special attorney appointment letter identical to Ms. Habba's). *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 89 n.10 (3d Cir. 2016) (noting that courts may take judicial notice of public records on government websites).

[215]  Doc. 108 at 24; Doc. 141 at 110:1-22.

But if the delegation is unlawful, then so are all of its applications. More directly,

the Supreme Court has advised that

> one who makes a timely challenge to the constitutional validity of the
> appointment of an officer who adjudicates his case is entitled to a
> decision on the merits of the question and whatever relief may be
> appropriate if a violation indeed occurred. Any other rule would create
> a disincentive to raise Appointment Clause challenges with respect to
> questionable judicial appointments."[216]

That sentiment has equal applicability to nonconstitutional appointments challenges,

and the same concerns about creating a disincentive to challenge invalid

appointments arise if I do not view the scope of the appointment as a whole.

Accordingly, I conclude that, as Special Attorney, Ms. Habba has been

delegated all of the powers of a United States Attorney and is acting on a level equal

to one holding the office in a PAS capacity.

### 3.    FVRA Bar

The FVRA's exclusivity provision provides that "[s]ections 3345 and 3346

are the exclusive means for temporarily authorizing an acting official to perform the

functions and duties of an Executive agency . . . for which appointment is required

to be made by the President, by and with the advice and consent of the Senate."[217]

As discussed earlier, the statute makes an exception for "a statutory provision

[which] expressly . . . authorizes the President, a court, or the head of an Executive

---

[216] *Ryder v. United States*, 515 U.S. 177, 182-83 (1995).
[217] 5 U.S.C. § 3347(a).

department, to designate an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity," and 28 U.S.C. § 546 does here.[218] But the statute goes on to clarify the scope of that exception, explaining that it does not apply to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head, or to reassign duties among, officers or employees of such Executive agency."[219] In other words, general vesting and delegation statutes may not be used to "temporarily authoriz[e] an acting official to perform the functions and duties of any [PAS] office."[220]

The Government's "Special Attorney" theory crashes headlong into this unambiguous barring provision. As I have concluded, Ms. Habba is performing all of the functions and duties of the United States Attorney, including "conduct[ing] . . . legal proceeding[s]" and "supervis[ing] . . . litigation" pursuant to the Attorney General's "delegat[ion]" of authority under the Department of Justice's general delegation statute, section 510.[221] That is exactly what section 3347(b) prohibits. The Government agrees.[222]

---

[218] *Id.* § 3347(a)(1)(A).

[219] *Id.* § 3347(b).

[220] *Id.* § 3347(a).

[221] *See* Doc. 114 at 3-5; Doc. 127 at 15-16 (describing vesting and delegation of authority).

[222] Doc. 142 at 9 ("As explained, the government agrees that the FVRA applies and that § 3347(b) forecloses the use of general delegation statutes to designate *acting officials*." (emphasis in original)); Doc. 141 at 106:21-107:18; *id.* at 129:3-10 ("[I]f the Attorney General had said . . . regardless of whether 3345 authorizes her to be the acting, I'm nonetheless designating her to

Reading section 3347(b) to apply to Ms. Habba's performance of the functions and duties of the United States Attorney as a Special Attorney is confirmed by the FVRA's legislative history. The FVRA's exclusivity provision was enacted for the *express purpose* of precluding the *exact argument* that the Government presses here. For years, the Department of Justice had argued that the Vacancies Act did not apply to it and that vacancies within DOJ were to be temporarily filled through delegation of the Attorney General's authority pursuant to sections 509 and 510.[223] Congress expressly rejected that interpretation, and manifested that rejection in section 3347(b).

The Government offers a number of arguments to the contrary. First, it makes two textual arguments: (1) Ms. Habba's Special Attorney appointment does not fall under section 3347 at all because she does not hold the title of "Acting" United States Attorney,[224] and (2) section 3347(b)'s reference to the "functions and duties" that

---

be the acting under my authority under 515. That is not what she did here. And that would not be lawful. I agree. That would definitely not be lawful.").

[223] S. Rep. 105-250 at 17 (1998) ("[Section 3347(b) forecloses the argument raised by the Justice Department that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department"); 144 Cong. Rec. 22508 (Sen. Thompson) ("The Justice Department relies on its organic statute's 'vesting and delegation' provision, which states that the Attorney General can designate certain other powers to whomever she chooses in the Department."); *id.* at 22511 (Sen. Byrd) ("Those two very broad, very general provisions . . . are being used to justify what amounts to an end run around the Vacancies Act" . . . "[T]o accept the position of the Department of Justice is to accept the position that the United States Senate . . . [W]ith the concurrence of the House of Representatives, has systematically divested itself of its constitutional responsibility to advise and consent to Presidential nominations."); *id.* at 22515 (Sen. Durbin) ("I wholeheartedly concur that this law needs clarification so that moves to end-run its application are halted."); *see SW Gen.*, 580 U.S. at 294-95.

[224] Doc. 127 at 17-18; Doc. 142 at 8-9.

may not be delegated includes only the vacant PAS office's exclusive and nondelegable functions and duties.[225] Second, it raises two practical arguments: (1) the functions and duties of a vacant PAS officer are frequently delegated to officials who are not in an "acting" role under the FVRA,[226] and (2) the consequences of holding that this type of delegation is prohibited would be severe. None of these arguments overcomes the plain meaning of section 3347(b).

### a.    Text

The Government's textual arguments are unconvincing. First, it argues that Ms. Habba is not an "acting official" subject to section 3347's provisions at all because she first held the office under section 546, which does not use the term "acting" and instead treats temporary appointees as full United States Attorneys, serving on an interim basis, and she now performs these duties as a "Special Attorney" and First Assistant United States Attorney. Essentially, it suggests that what it admittedly cannot achieve in name, it can do in practice. Second, it contends that "functions and duties" is a narrow term of art defined by statute to refer only to a PAS-officer's exclusive and nondelegable duties. Neither position is correct with regard to section 3347.

First, the FVRA's use of the term "acting" is general, not a term of art. The statute itself does not define the term. But Black's Law Dictionary explains that it

---

[225]  Doc. 127 at 18-20.
[226]  *Id.* at 20-21; Doc. 142 at 10.

means "[h]olding an interim position; serving temporarily."[227] And "acting officer" is defined simply as "[o]ne performing the duties of an office—usually temporarily—but who has no claim of title to the office."[228] That common understanding is just how the statute uses the term throughout its provisions: one who is "performing the functions and duties of the office temporarily" is doing so "in an acting capacity."[229] And those definitions all describe exactly what Ms. Habba is doing, regardless of her technical title:[230] she is temporarily performing the duties of the office of the United States Attorney while it is vacant.

This understanding is confirmed by the FVRA's description of position-specific statutes subject to the barring provision's exception. That exception only applies to statutory provisions which permit a proper person "to designate an officer or employee to perform the functions and duties of a specified office temporarily in an *acting capacity*."[231] If "acting" is a term of art, statutes subject to this exception should be expected to describe the temporary service that they authorize in the same

---

[227] *Acting*, Black's Law Dictionary (7th ed. 1999).

[228] *Acting Officer*, Black's Law Dictionary (7th ed. 1999); *see also Acting-order*, Oxford English Dictionary (2d ed. 1989) ("a temporary appointment to a vacant position made by one entitled to do so, but which may or may not be confirmed by the superior authority").

[229] 5 U.S.C. §§ 3345(a)(1)–(3).

[230] *See Bullock v. United States Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1127 (D. Mont. 2020) ("The Interior Secretary carefully crafted the Secretarial Order to avoid designation of Pendley as 'Acting BLM Director,' but the Executive Branch cannot use wordplay to avoid constitutional and statutory requirements."); *cf. L.M.-M.*, 442 F. Supp. 3d at 26 ("[L]ables— without *any* substance—cannot satisfy the FVRA's default rule under any plausible reading of the statute." (emphasis in original)); Doc. 141 at 85:1-4 (contending that "formal distinction [in titles] [does not] really make[] a difference."); Doc. 114 at 7 (contending that title makes no difference).

[231] 5 U.S.C. § 3347(a)(1) (emphasis added).

way.[232] Some do, but others do not. Section 546, to pick a random one, describes its temporary officers as full "United States attorney[s]," just ones subject to strict time limitations.[233] Another, 28 U.S.C. § 508(a), provides that "[i]n case of a vacancy in the office of Attorney General . . . the Deputy Attorney General may exercise all the duties of that office."[234] And a third, 29 U.S.C. § 552, states that "[t]he Deputy Secretary [of Labor] shall . . . in case of [a vacancy,] perform the duties of the Secretary."[235]

At bottom, the Government's strict reading of "acting" would render section 3347(b) surplusage. If a formal "acting" title is necessary to be subject to any part of section 3347 and, as the Government contends, performing the full functions and duties of a vacant PAS office pursuant to a delegation by the agency head does not result in an "acting" title, then section 3347(b) will never take effect. The occurrence of its conditions will always go hand-in-hand with the lack of an "acting" designation, and section 3347(b) will therefore be self-defeating.[236] That result is not

---

[232] *See United States v. Davis*, 588 U.S. 445, 458 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning." (citing *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990))).

[233] 28 U.S.C. § 546(a); *see* S. Rep. 105-250 at 15, 17 (describing existing statutes subject to exclusivity provision's exception and listing 28 U.S.C. § 546).

[234] 28 U.S.C. § 508(a); *see* S. Rep. 105-250 at 16 (listing 28 U.S.C. § 508). Subsection (b) of the same statute does use the term "act," but this just goes to show that "acting" can describe the general performance of duties.

[235] 29 U.S.C. § 552; *see* S. Rep. 105-250 at 16 (listing 29 U.S.C. § 552)

[236] *See United States v. Davis*, 588 U.S. 445, 489 (2019) (Kavanaugh, J., dissenting) ("The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing." (collecting authority)).

textually sound, so the Government's argument that section 3347 does not apply because Ms. Habba is not performing her duties as an "acting official" fails.[237]

Second, the Government's contention that section 3347's application to "functions and duties" refers only to the exclusive and nondelegable duties of an office is not textually supported. The source of the Government's narrow definition of "functions and duties" comes from section 3348, which defines "function or duty" as "any function or duty of the applicable office that . . . is established by statute; and . . . is required by statute to be performed by the applicable officer (and only that officer)."[238] But, as the Government acknowledges,[239] the definitions in section 3348 are expressly limited to application "in this section."[240] In addition to that explicit and unambiguous limitation, two textual considerations convince the Court that "functions and duties" is used in a more general sense throughout the rest of the statute.

---

[237] The Government contends that *Gonzales & Gonzales Bonds & Insurance Agency Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 & n.7 (9th Cir. 2024), supports its reading, but *Gonzales* says nothing like the Government's assertion. Because I rely on *Gonzales* in the next section, I do not belabor the distinction now. Similarly, the Government's reliance on *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1338 (Fed. Cir. 2022), is not convincing because, as I note later, I find that decision unpersuasive.

[238] 5 U.S.C. § 3348(a)(2); *see Gonzales*, 107 F.4th at 1073-74 (describing such duties as "exclusive, or nondelegable")

[239] Doc. 142 at 8.

[240] 5 U.S.C. § 3348(a); *Gonzales*, 107 F.4th at 1078 & n.6 ("3347(b) clarifies that general vesting-and-delegation statutes are not sufficient to authorize the department to choose the acting officer under the FVRA, but this does not impact the meaning of 'function or duty' in § 3348. That a department head cannot rely on a general vesting-and-delegation statute to designate the acting officer in the event of a vacancy, § 3347(b), answers a question wholly distinct from the consequences of violations of the FVRA under § 3348.").

First, the definition itself makes clear that "function or duty" also has a general meaning, because it is self-referential, defining "'function or duty'" as "*any* function or duty of the applicable office that" is subject to certain conditions.[241] Second, reading "functions and duties" narrowly throughout the statute renders the entire scheme incredibly insignificant. Every individual who may serve under the statute is only authorized to "perform the functions and duties of the office."[242] On the Government's understanding, this would vest acting officers with essentially no responsibility or authority in many cases. Any powers of the vacant office that are nonexclusive or delegable would not be automatically conferred, and could only be exercised by the acting official through a delegation of those functions in addition to the FVRA.[243] That is clearly not the scheme Congress contemplated, and reading "functions and duties" in the broader sense of *all* functions and duties of the vacant office in provisions of the FVRA other than section 3348 is the better textual understanding of the statute.[244]

*Kajmowicz v. Whitaker* is in no way to the contrary. True, in *Kajmowicz* the United States Court of Appeals for the Third Circuit quoted broad language from the

---

[241] 5 U.S.C. § 3348(a)(2) (emphasis added).

[242] *Id.* §§ 3345(a)(1)–(3).

[243] In post-argument briefing the Government acknowledges this point and argues against such an outcome. *See* Doc. 142 at 8 ("Indeed, when § 3345(a) authorizes certain officials to 'perform the functions and duties of the vacant office temporarily in an acting capacity,' that authority includes *all* of the functions of the vacant office—both delegable and nondelegable." (emphasis in original)).

[244] *See Function*, Black's Law Dictionary (7th ed. 1999) ("Office; duty; the occupation of an office.").

United States Court of Appeals for the Federal Circuit's opinion in *Arthrex, Inc. v. Smith & Nephew, Inc.*, and stated that "[t]he statutory language is unambiguous: the Vacancies Reform Act applies only to functions and duties that a Presidentially appointed and Senate-confirmed officer alone is permitted by statute . . . to perform. It does not apply to delegable functions and duties."[245] But, as the Government acknowledges,[246] the sole question in *Kajmowicz* turned on the interpretation of section 3348, and the Third Circuit never mentioned section 3347—or any other FVRA provision other than section 3348—in the analysis.[247] Thus, the Third Circuit never confronted the question of whether section 3348's definition applies to other sections.

*Arthrex* applied the section 3348 definition of "functions and duties" to the entire statute. But that opinion is not binding authority, and I find the reasoning that led it to apply the section 3348 definition statute-wide unconvincing.[248] The Federal Circuit never so much as mentioned the limiting provision in section 3348(a)'s chapeau and was clearly extremely concerned with the "significant consequences" of holding otherwise, apparently without considering that section 3348's definition

---

[245] *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022) (quoting *Arthrex*, 35 F.4th at 1336) (original alterations omitted)

[246] Doc. 142 at 10 ("*Kajmowicz* involved ratification and did not present the precise circumstance here.").

[247] *Kajmowicz*, 42 F.4th at 145 (sole reference to section 3347).

[248] *Cf. Gonzales*, 107 F.4th at 1073 (narrowing the holding of *Arthrex* to only the FVRA's "ratification bar"); *Kajmowicz*, 42 F.4th at 151 (altering passages from *Arthrex* to change "FVRA" to "section 3348").

might be limited to only that section.[249] Moreover, *Arthrex* appears to misunderstand section 3347(b), explaining that it "merely provides that a statute granting the head of an agency 'general authority . . . to delegate [his] duties' does not exempt the agency from the FVRA," which is a good deal less than what section 3347(b) does, as explained earlier.[250] Thus, *Arthrex* is not persuasive.[251]

### b.    Practice

As is starting to seem familiar, the Government turns to practice and consequences to find an exception to the plain statutory text. It explains that the functions and duties of many vacant offices in the Executive are commonly performed by officials who have been delegated those authorities outside of the FVRA's framework. And it warns that reading the FVRA to bar such delegation would require important offices to sit vacant. Both of those contentions fall short.

First, as I have already described, Executive practice under the FVRA is not useful evidence of the meaning of the statutory text. The FVRA is a relatively young provision, and it is common knowledge that the Executive has a history of

---

[249] *Arthrex*, 35 F.4th at 1337.

[250] *Id.* at 1338.

[251] To the extent they have precedential value, I also find *Schagticoke Tribal Nation v. Kempthorne* 587 F.3d 132, 134-35 (2d Cir. 2009), and *Stand Up for California! v. United States Dep't of the Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021), distinguishable for similar reasons. *Schagticoke*, a *per curiam* opinion, did not limit section 3348's definitions to that section and did not discuss section 3347. 587 F.3d at 134-35. And in *Stand Up* the FVRA claims were "not raised . . . on appeal," so the panel only used the statute as a "guidepost." 994 F.3d at 622 n.2. Moreover, the panel did not appear to limit the section 3348 definitions to that section, nor did it discuss section 3347. *Id.* at 622.

"disregard[ing] [related acts'] restrictions on the service of acting officials."[252] Practice cannot overcome the text.

Second, the Government is correct that consequences will follow from my interpretation of section 3347(b). But those consequences are the ones that Congress explicitly chose and, in any case, they are not particularly severe. Congress anticipated that there would be times when the FVRA and position-specific statutes could no longer provide an officer to temporarily perform the functions and duties of a PAS office.[253] In those cases "the office shall remain vacant," and "only the head of such Executive agency may perform any function or duty of such office."[254] If someone other than the head of the agency performs the (narrowly defined) functions and duties of the vacant office, that action "shall have no force or effect," and "may not be ratified."[255] The upshot of this scheme is that, once FVRA and position-specific temporary appointments statutes have been exhausted, no one may hold the vacant office in *any* capacity, and only the department head may perform the exclusive and nondelegable duties of that office. If anyone else performs such duties, those actions are forever void. As to the vacant office's nonexclusive and delegable duties—those not covered by the narrow definition of "function or

---

[252] *Kajmowicz*, 42 F.4th at 145.
[253] 5 U.S.C. § 3348(b) (describing what happens when the duties of the vacant office are not being performed in compliance with the FVRA).
[254] *Id.* §§ 3348(b)(1)–(2). Note that here, the narrower definition of "function or duty" as exclusive and nondelegable duties *does* apply. *Id.* § 3348(a)(2).
[255] *Id.* §§ 3348(d)(1)–(2).

duty"[256]—they may not all be vested in a single person through delegation.[257] But even if such an invalid delegation occurs, actions involving those nonexclusive and delegable duties are not automatically void, and may be ratified.

Through one more translation from statutory complexity to common English, it becomes clear that Congress has created a logical scheme of rules and consequences. When there is no longer any way to perform the functions or duties of a PAS office under the FVRA, the office is vacant.[258] The statute then creates a two-tiered system for handling the functions and duties (broader definition) of the office during the vacancy. For the most important functions and duties—those that are exclusive and nondelegable (i.e., narrower definition)—the agency head can validly continue performing them,[259] but if anyone else does so, those actions are void and nonratifiable.[260] This ensures that these important functions can continue to be performed while the vacancy is pending, but only by a person of high authority. For the less important functions and duties, those that are nonexclusive and delegable, they may not be performed through a full-scale delegation of all of the functions and duties of the vacant office to a single official.[261] But since less care is

---

[256] *Id.* § 3348(a)(2).
[257] *Id.* § 3347(b). I do not express any opinion on the possibility of parceling out these duties to separate individuals or delegating only a clearly limited subset of nonexclusive and delegable duties.
[258] *Id.* § 3348(b)(1).
[259] *Id.* § 3348(b)(2).
[260] *Id.* §§ 3348(d)(1)–(2).
[261] *Id.* §§ 3347(b), 3348(b)(1).

necessary for these shared duties, if they are improperly performed they are not automatically void and may be ratified.[262] So even if the Executive does improperly delegate such authority, in many cases the consequences will not be particularly severe, at least after the fact.

Finally, the Government's focus on section 3348 and the possibility of ratification of the nonexclusive and delegable functions and duties performed by someone who is appointed in violation of the FVRA is misplaced given the posture of this case. I agree with the Third Circuit and the United States Court of Appeals for the Ninth Circuit that many if not all actions of most PAS officers taken in violation of the FVRA will not ultimately be declared void because they will be ratifiable.[263] But both of those cases involved a *post-action* challenge to an action that *had already been ratified*.[264]

Here, the defendants seek relief while Ms. Habba is currently wielding all of the functions and duties of the PAS office and ask that she *be barred from taking*

---

[262] *Id.* §§ 3348(d)(1)–(2).

[263] *See Kajmowicz*, 42 F.4th at 151 ("[W]e acknowledge that most statutes that confer authority will permit subdelegation, which means that many statutory functions and duties will be ratifiable under the Vacancies Reform Act."); *Gonzales*, 107 F.4th at 1076-77. The ratification cases undermine the Government's position that delegable duties can be undertaken by anyone, regardless of appointment. If the Government is correct that any delegable and nonexclusive duties may be performed lawfully as a result of delegation, then there is never any need to ratify any of those actions. Thus, *Kajmowicz* and *Gonzales* implicitly conflict with *Schagticoke* and *Stand Up*.

[264] *Kajmowicz*, 42 F.4th at 146 (noting that "Attorney General Barr . . . ratified" the action before the district court ruled); *Gonzales*, 107 F.4th at 1071 (noting that "Secretary Alejandro Mayorkas . . . ratified the Rule" before the district court ruled).

*future action*. For them, the prospect of ratification is little solace.[265] As the Ninth Circuit explained, "subsequent ratification of an action taken by an improperly appointed Acting Secretary is not inevitable. The subsequent Secretary would have to exercise his lawful authority to ratify the action, an action he could take independently in his capacity as Secretary, and only if Congress had not made that earlier action nondelegable."[266] Indeed, the Ninth Circuit expressly envisioned the situation at hand: "agencies hypothetically could rely on their vesting-and-delegation authority, even if knowingly violating the FVRA, *but that would neither make their actions immediately lawful nor ensure their ratification*."[267] As I noted in my prior opinion, the defendants face an imminent threat of Ms. Habba taking action against them[268] and I have concluded that she is not lawfully holding the office of United States Attorney. So if and when she takes those actions, they will be "immediately [un]lawful" unless and until they are ratified following independent review by a properly appointed official.[269]

---

[265] *See Guedes*, 920 F.3d at 13-14 (describing the need for judicial review in a situation where the decision of a challenged appointee would always be subject to ratification before judicial review would become available (citing *Landry v. FDIC*, 204 F.3d 1125, 1131-32 (D.C. Cir. 2000))); *L.M.-M.*, 442 F. Supp. 3d at 22 (noting that challenges may be brought "even when a properly appointed official might have reimposed the challenged action").

[266] *Gonzales*, 107 F.4th at 1077.

[267] *Id.* at 1077 (emphasis added).

[268] Doc. 116 at 19-20.

[269] *Gonzales*, 107 F.4th at 1077.

In this posture, the only sure solution for the defendants' timely challenge, as I have noted before, is to bar Ms. Habba from taking such actions in the first place.[270] Finally, for the one past action that has been challenged that falls during a term when Ms. Habba was unlawfully appointed, signing Mr. Pina's indictment, the Government does not identify any ratification that has occurred. So although that act may not be automatically "void," it was and remains "voidable."[271] And with no ratification before or since Mr. Pina's challenge, I now declare that action void in violation of section 3347(b).

*    *    *

All of this is a long way of saying that section 3347(b) is effective, and that it means what it says. To temporarily perform the full panoply of the functions and duties of a vacant PAS office, a person must be eligible to do so under the FVRA or a position-specific statute. The general vesting and delegation provisions that exist for every department head in the Executive do not create alternative paths for authorizing someone to temporarily perform those functions and duties. Section 3347(b) thus precludes the Special Attorney argument in its entirety.

---

[270] Doc. 116 at 19; *see Bullock*, 489 F. Supp. 3d at 1130-31 (enjoining officer appointed in violation of the FVRA from exercising the authority of the office).

[271] *Gonzales*, 107 F.4th at 1077 (quoting *Hooks*, 816 F.3d at 564).

### 4.    Statutory Conflicts

Even if the FVRA does not prohibit the delegation of the United States Attorney's powers to Ms. Habba, using 28 U.S.C. §§ 509, 510, 515, 519, and 543 to vest an Attorney-General-appointed Special Attorney with all of the powers of the United States Attorney for an unlimited term raises direct conflicts with other, more specific statutes dealing with United States Attorneys.[272] The Government's delegation theory fails for this additional and independent reason. The statutory conflict implicates three related canons of statutory interpretation.

First, as I have already explained, the Surplusage Canon "prevents . . . an interpretation that renders [a provision] pointless."[273] But if the Government's array of provisions empowers the Attorney General to appoint a Special Attorney with all of the powers of a United States Attorney for an unlimited period, then the entirety of the actual United States Attorney provision, section 541, which requires nomination by the President and confirmation by the Senate, sets a term limit of four years, and limits removal to the President, is surplusage which the President may invoke at will.[274]

---

[272] *See* Doc. 121 at 23; *Pina* Doc. 52-1 at 32-34.

[273] Scalia & Garner at 176; *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (Reading one statute to negate another "would violate the canon against interpreting any statutory provision in a manner that would render another provision superfluous. . . . This principle, of course, applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." (citing *Corley v. United States*, 556 U.S. 303, 314 (2009) and *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 529-30 (1939)).

[274] 28 U.S.C. § 541.

Second, the Government's reading would conflict with the Related-Statutes Canon, which provides that "laws dealing with the same subject . . . should if possible be interpreted harmoniously."[275] That canon is based on the principles "(1) that the body of law should make sense, and (2) that it is the responsibility of the courts, within permissible meanings of the text, to make it so."[276] Reading the Special Attorney statutes to permit supplantation of the United States Attorney statute creates discord between the provisions by employing one to circumvent limits attendant in the other.

Finally, even if the Government's reading were correct, the statutes would conflict, and the General/Specific Canon would advise that "the specific provision is treated as an exception to the general rule."[277] Here, the general provisions dealing with delegable powers must yield to the specific provision describing the rules that attend vesting an officer with the powers of the United States Attorney.

The Government responds that all of these concerns about the continued viability of section 541 are overblown because a Senate-confirmed United States Attorney has more "gravitas" than someone performing the functions and duties of the office pursuant to a delegation.[278] That may be so, but that theoretical limit would

---

[275] Scalia & Garner at 252; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[276] Scalia & Garner at 252.

[277] Scalia & Garner at 183; *see United States v. Rose*, 538 F.3d 175, 183 (3d Cir. 2008) ("[W]e avoid 'applying a general provision when doing so would undermine limitations created by a more specific provision.'" (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996))).

[278] Doc. 127 at 23; Doc. 141 at 133:16-23.

be cold comfort to Congress, which chose to make Senate confirmation mandatory for United States Attorneys,[279] rather than optional if the President wants a bit more gravitas.

Accordingly, the Special Attorney theory fails based on conflicts with section 541.

### D.    Constitutional Claims

The Girauds press several constitutional claims, focusing primarily on the theory that Ms. Habba's appointment violates the Appointments Clause.[280] But I have resolved the statutory claims in their favor and, as previously noted, that entitles them to the only remaining relief that they seek.[281] Because "the statutory grounds [are] dispositive," I do not reach the constitutional issues.[282]

### E.    Final Timeline and Holdings

I have concluded that Ms. Habba has unlawfully acted in the role of the United States Attorney for the District of New Jersey since July 1, 2025. Below, I lay out the relevant timeline of events in table form, incorporating my holdings by including statutory citations.

---

[279] 28 U.S.C. § 541.

[280] Doc. 121 at 19-22; Doc. 143 at 4-5.

[281] *Califano v. Yamasaki*, 442 U.S. 682, 692-93 (1979) (citing *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582-83 & n.22 (1979)).

[282] *Beazer*, 440 U.S. at 582.

| Date | Event | Statute |
|---|---|---|
| January 8, 2025 | The office of the United States Attorney becomes vacant when Philip Sellinger resigns. | 5 U.S.C. § 3345(a) |
| January 8, 2025 | First Assistant United States Attorney Vikas Khanna becomes Acting United States Attorney as first assistant at the time of the vacancy. | 5 U.S.C. § 3345(a)(1) |
| March 3, 2025 | John Giordano is appointed Interim United States Attorney. | 28 U.S.C. § 546(a) |
| March 28, 2025 | Alina Habba is appointed Interim United States Attorney. | 28 U.S.C. § 546(a) |
| July 1, 2025 | Ms. Habba's appointment as Interim United States Attorney ends. | 28 U.S.C. § 546(c)(2) |
| July 22, 2025 | The United States District Court for the District of New Jersey appoints Desiree Grace United States Attorney. The appointment is effective immediately because Ms. Habba's term as Interim United States Attorney expired on July 1. | 28 U.S.C. § 546(d) |
| July 24, 2025 | Ms. Habba is appointed Special Attorney and First Assistant United States Attorney and unlawfully delegated all of the powers of the United States Attorney. | 5 U.S.C. § 3347(b) |

| Date | Event | Statute |
|------|-------|---------|
| July 26, 2025 | Ms. Grace is terminated as United States Attorney by President Trump. Ms. Habba does not become Acting United States Attorney as a post-vacancy-appointed first assistant. | 28 U.S.C. § 541(c); 5 U.S.C. § 3345(a)(1) |

## F.    Dismissal of Mr. Pina's Indictment

The Government argues that Mr. Pina's indictment should not be dismissed, even if Ms. Habba's actions were not statutorily permissible.[283] I have previously determined that Ms. Habba was not lawfully serving as the United States Attorney when she signed Mr. Pina's indictment on July 7, 2025, and I have voided her act of signing that document. That leaves the question of whether an indictment that does not bear a valid signature must be dismissed. I conclude that dismissal is not necessary.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be signed by an attorney for the government."[284] But precedent states that a defect in this signature is a "technical deficienc[y] that [is] not necessarily fatal to the indictment."[285] That is because "[t]he Supreme Court . . . has long viewed a government lawyer's indictment signing as 'necessary only as evidence of the

---

[283] Doc. 142 at 11-14.

[284] Fed. R. Crim. P. 7(c)(1).

[285] *United States v. Kelley*, 404 F. Supp. 3d 447, 452 (D. Mass. 2019) *aff'd*, 989 F.3d 67 (1st Cir. 2021) (quoting *United States v. Irorere*, 228 F.3d 816, 830-31 (7th Cir. 2000)).

authenticity of the document.'"[286] Furthermore, courts have concluded that a defect in the government attorney's signature is "nonjurisdictional" and subject to "harmless error analysis."[287] Under the harmless error rule, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."[288]

This standard makes sense, considering that the grand jury "is a constitutional fixture in its own right," which "belongs to no branch of the institutional Government."[289] Thus, to dismiss an indictment, a defendant generally must show that some kind of misconduct prejudiced him with regard to the grand jury proceeding.[290]

In cases involving the validity of the Government attorney's signature, courts have generally reviewed the facts of the grand jury proceeding to determine whether the indictment signer was acting alone in conducting the grand jury proceeding.[291] Here, the Government has submitted for *in camera* review internal documents

---

[286] *Kelly v. United States*, 989 F.3d 67, 70 (1st Cir. 2021) (quoting *Wheatley v. United States*, 159 F.2d 599, 600 (4th Cir. 1946)).

[287] *United States v. Easton*, 937 F.2d 160, 162 (5th Cir. 1991) (citing *United States v. Boruff*, 909 F.2d 111, 118 (5th Cir. 1990)).

[288] Fed. R. Crim. P. 52(a).

[289] *United States v. Williams*, 504 U.S. 36, 47 (1992) (quoting *United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir. 1977) and *Stirone v. United States*, 361 U.S. 212, 218 (1960)).

[290] *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988).

[291] *Kelley*, 989 F.3d at 70-71; *Kelley*, 404 F. Supp. 3d at 452 ("[M]ultiple courts have held that an indictment is not invalid if the prosecutor was not licensed to practice if other evidence indicates that the government endorsed the prosecution.").

relating to the grand jury proceeding, along with grand jury materials.[292] I have reviewed those materials, and they clearly indicate that the Government's investigation into Mr. Pina, which was presented to the grand jury, predated the period during which Ms. Habba was unlawfully serving as the Interim United States Attorney. Furthermore, internal routing documents verify that the line Assistant United States Attorneys prosecuting Mr. Pina's case began receiving supervisory approvals to submit the case to a grand jury before July 1, 2025, when Ms. Habba's service became unlawful. There is no indication that Ms. Habba had a role in any of these decisions, or in the grand jury proceeding other than to ultimately sign the indictment. Accordingly, her invalid signature is a mere technical defect that amounts to harmless error that I should "disregard."[293]

In response to the Government's submission, Mr. Pina submitted a letter speculating that Ms. Habba may have played a role in influencing the charges that were included in his indictment.[294] He contends that he "should have access to those documents and the Government should be compelled to respond to the questions posed about Ms. Habba's role, if any."[295] To gain access to grand jury materials, a defendant must show "that a ground may exist to dismiss the indictment because of

---

[292] *See* Doc. 142 at 13 n.4. *In camera* review is appropriate given the secrecy requirements that attend grand jury proceedings. Fed. R. Crim. P. 6(e)(2).

[293] Fed. R. Crim. P. 52(a).

[294] *Pina* Doc. 67.

[295] *Id.*

a matter that occurred before the grand jury."[296] "Vague allegations, bald assertions of impropriety, or speculation about what the grand jury materials may reveal are insufficient to establish a particularized need for disclosure."[297] Mr. Pina's arguments do not meet the bar for disclosure.

Not only does Mr. Pina merely speculate that Ms. Habba had a role in the proceeding based on a general public statement from Ms. Habba regarding Paterson, New Jersey, and the inclusion of a count alleging that Mr. Pina bribed a Paterson official (who sat on the Zoning Board, an office wholly unrelated to Ms. Habba's statement regarding immigration),[298] he does not account for the fact that Ms. Habba may have validly influenced the preparation of his indictment before July 1, 2025, when her appointment became unlawful. Given that the case was in the process of approval for submission to the grand jury before Ms. Habba's service as Interim United States Attorney became invalid, Mr. Pina has not raised a particularized reason why disclosure may demonstrate impropriety that would result in dismissal.

Accordingly, I deny Mr. Pina's motion to dismiss the indictment despite Ms. Habba's defective signature. I additionally deny his request for access to the grand jury materials.

---

[296] Fed. R. Crim. P. 6(e)(3)(E)(ii); *see United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) ("To support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy." (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1957)).

[297] *United States v. Dudenhoefer*, No. 21-CR-0039, 2023 WL 7411000, at *6 (W.D. Pa. Nov. 9, 2023) (collecting authority).

[298] *See Pina* Doc. 44 ¶ 15-18.

## IV.  CONCLUSION

For the above-stated reasons, the remaining aspects of the Girauds' motion is granted, and Mr. Pina's motion is granted in part and denied in part. I disqualify Ms. Habba from engaging in the prosecutions of the Girauds and Mr. Pina, and from supervising the same. Any Assistant United States Attorney who prosecutes the Girauds or Mr. Pina under the supervision or authority of Ms. Habba in violation of my Order is similarly subject to disqualification.  I deny Mr. Pina's motion to dismiss the indictment and his request for access to the grand jury proceedings. The Court will stay this decision and its effects pending the resolution of any appellate proceedings.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding